**WOOD PRESERVING CORPORATION OF BALTIMORE, Inc.**

v.

**UNITED STATES of America.**

Civ. No. 14434.

United States District Court
D. Maryland.

Sept. 18, 1964.

Richard W. Kiefer, Baltimore, Md. (Hooper, Kiefer & Perrott, Baltimore, Md., on the brief), for plaintiff.

John M. Hammerman and Moshe Schuldinger, Attorneys, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., and Thomas J. Kenney, U. S. Atty., Baltimore, Md., on the brief), for defendant.

THOMSEN, Chief Judge.

This is an action to recover certain taxes and interest alleged by plaintiff (Wood Preserving) to have been erroneously assessed and collected for the fiscal years ended June 30, 1958, 1959 and 1960, in the amounts of $5,203.19, $5,121.05 and $3,058.20, respectively, plus interest. The case was tried before the Court without a jury. Several issues are presented, namely:

Issue 1. Whether the depreciation figures fixed by the Commissioner for a building, railroad track, and other equipment were erroneous, and, if so, whether Wood Preserving has established what rates would be reasonable and proper.

Issue 2. Whether the Commissioner erroneously disallowed the claimed deductions for the following repairs: 1958 —relining fire box of boiler; rewiring electric motor and replacing steam pipe; 1960—replacing steam pump, which became worn out shortly after being installed.

Issue 3-A. Whether cash advances made to Wood Preserving by F. Bowie Smith (Smith), its sole stockholder, and expenditures made for its account by him, during the fiscal years 1955 and 1956, totaling $131,000.11, were loans or contributions to capital; hence, whether payments made by Wood Preserving to Smith during the fiscal years 1958, 1959

and 1960 were deductible as interest payments by Wood Preserving on its income tax returns.

Issue 3-B. Whether a cash advance of $52,000 made to Wood Preserving by Smith on June 30, 1960, was a loan or a contribution to capital. Although no deduction was claimed for interest on this item during the fiscal year 1960, since the advance was made on the last day of that fiscal year, it would be difficult to arrive at a fair decision on Issue 3-A without considering all developments through June 30, 1960. Moreover, the question whether the $52,000 advance was a contribution to capital or a loan turns on the same authorities and much of the same evidence which the Court must consider in deciding Issue 3-A. The Court has therefore acceded to the request of the parties that it state its opinion with respect to the nature of the $52,000 advance.

After hearing evidence the Court rendered an informal oral opinion, finding the ultimate facts, discussing the authorities relied on by the respective parties and the reasons for the conclusions reached.

1.

■ With respect to Issue 1, the Court found that Wood Preserving had met the burden of proof on this point and had shown that the following figures were reasonable and proper: Building, 25 years or 4%; All equipment except railroad track, 10 years or 10%; Railroad track, 20 years or 5%.[1]

2.

■ With respect to Issue 2, the Court found that Wood Preserving had established that the items in question were properly deductible as repairs except for the relining of the fire box, one-half of the cost of which should be allowed as a repair expense and one-half should be treated as a capital item. See 4 Mertens,

[1] There is no dispute as to the cost of the items involved in Issues 1 and 2, and the Court is advised that neither side disputes its conclusion on those issues. It is therefore unnecessary to state the evidence with respect thereto.

Law of Federal Income Taxation, Zimet & Diamond Revision, § 25.41.

### 3.

With respect to Issue 3–A, the Court found and held that $128,500.11 of the $131,500.11 advances and expenditures by Smith in 1955 and 1956 were capital contributions and not loans. The remaining $2,500 represented money which Smith made available to meet an expected need which did not materialize; it was debited and credited the same day.

With respect to Issue 3–B, the Court found that the entire $52,000 advanced in June 1960 was a loan and not a contribution to capital.

### 3–A.

*The $131,500 Advances and Expenditures in 1955 and 1956*

Before a judgment was entered Wood Preserving moved for a new trial, seeking to have the Court reconsider its findings and conclusions with respect to Issue 3–A and to consider certain additional testimony and exhibits, listed in proposed findings of fact filed by Wood Preserving. The Government objects to the proposed new evidence as irrelevant and immaterial; it does not dispute the historical facts, although it argues with justification that some of the inferences Wood Preserving asks the Court to draw are not supported by the weight of the credible evidence. The Court has decided to admit in evidence and has carefully considered all of the proposed new evidence and exhibits, and has made findings of fact with respect thereto. The Court has reviewed all the evidence and the authorities cited at the trial, as well as the additional authorities cited in the briefs and at the hearing on the motion for new trial. The Court adheres to its former conclusions, for the reasons stated herein.

### Facts

The Court has ruled on each of the proposed findings of fact presented by Wood Preserving and has made such additional findings as are necessary to understand the case. For the purposes of this opinion it will be sufficient to summarize the basic facts and to state the reasons for the findings of ultimate fact and the conclusions reached by the Court on Issues 3–A and 3–B.

In 1928 Smith launched a lumber business, which began as an individual proprietorship with very small capital, prospered over the years, became a partnership, and since 1950 has been operated as a corporation under the name F. Bowie Smith & Son, Inc., with Smith as the majority stockholder, and with a large net worth. On April 1, 1955, with the intention of building a wood treating plant, Smith acquired land in Baltimore City which had been the site of a stove factory; most of the buildings had been destroyed or gutted by fire. Smith learned that George Hathaway, of Jersey City, N. J., and the Hathaway Patterson Co. (collectively, Hathaway) were also planning to build in Baltimore a wood treating plant and a plant to manufacture cross-arms for public utility poles. Smith and Hathaway joined forces and formulated a plan whereby Hathaway would supervise the erection of a wood treating plant on the property recently acquired by Smith and would become general manager of the plant after it began operations.

To implement the plan, Wood Preserving was incorporated on April 26, 1955, and on April 28 Smith purchased 250 shares of its capital stock for $25,000. No one else has ever purchased any of its stock.

The entire $25,000 was paid to Wood Treating Chemicals Co. on account of the purchase price ($73,850) of a wood treating plant, the balance of $48,850 being represented by five notes for $9,770, payable one a year over a period of five years. The plant was shipped to Baltimore to be erected on part of the land Smith had purchased.

On July 1, 1955, Smith leased the entire tract to F. Bowie Smith & Son, Inc. That corporation in turn subleased part

of the land to Wood Preserving, the rent to be based on a sliding scale percentage of sales, with the right in F. Bowie Smith & Son, Inc., to purchase the improvements at the end of the lease or of any renewal thereof. F. Bowie Smith & Son, Inc., also leased to Hathaway a portion of the land for a cross-arm plant.

Wood Preserving agreed to employ Hathaway for five years at $10,000 a year, plus 10% of Wood Preserving's profits for each year. Wood Preserving was given the option to postpone Hathaway's compensation by issuing to him its promissory notes, payable at the end of the five year period, with interest at 5%, guaranteed by F. Bowie Smith & Son, Inc. Wood Preserving exercised that option and the notes were eventually issued and endorsed.

Smith and the secretary of Wood Preserving testified that they had hoped to be able to complete the installation of the plant and the other improvements to the property leased to Wood Preserving at a cost of not over $35,000 or $40,000, and to have the plant in operation by October 1955. The necessary money was to be advanced by Smith. Difficulties, however, were encountered from the beginning; the plant and equipment arrived later than expected; construction problems developed because the ground contained old concrete pilings and construction steel; a manager and other employees were hired to begin work on September 1, 1955, and were on the payroll but idle until the beginning of 1956, when production started; Hathaway and Smith had a disagreement, as a result of which Hathaway's services were in effect dispensed with, though the agreement to give him five $10,000 notes payable at the end of five years was kept in force; sales did not develop as anticipated. Consequently, Smith advanced cash to Wood Preserving and made expenditures to purchase and install equipment for it during the period from June 30, 1955, to May 11, 1956, in the total amount of $131,000.11.

All of those advances and expenditures were carried on Wood Preserving's books as credits on a ledger account entitled "F. Bowie Smith". That ledger account was opened on July 1, 1955, with a debit entry "Sundries, Stock—$25,000" and with the following credit entries:

"Wood Treat Chem.      $25,000.00
Arundel Laundry         4,000.00
By expenditures to 9/30 1,141.03
Cash                    1,000.00"

Later advances by Smith were credited to the account as "Cash", except for the entry dated December 31, 1955, "By expenditures 12/31, $48,859.08". The only other debit entry before June 30, 1956, was a $2,500 item on April 12, 1956, with a matching credit entry on the same date.[2] The credit balance just before June 30, 1956, was $128,500.11.[3]

No interest was credited or paid until June 30, 1956, when a credit entry was

[2] Representing money which Smith made available to meet an expected need which did not materialize.

[3] The exact purposes for which much of the $128,500.11 was used is not clear from the evidence. The ledger indicated that some $63,000 went into machinery and equipment or improvements to the buildings on a cost plus basis; $9,000 was spent for track and the like; about $10,000 was necessary to carry the corporation for the month or two before the expected opening date; the remaining $40,000 or so was evidently used for additional machinery and equipment.

The June 30, 1956 balance sheet of Wood Preserving indicates that about $60,000 of the $128,500.11 was spent for improvements to the leased property and about $50,000 for machinery and equipment, in addition to the $74,080 ($25,000 cash and $49,080 notes) paid for the plant and about $6,000 worth of machinery bought for the account of Wood Preserving by F. Bowie Smith & Son, Inc.

That balance sheet showed the total cost of machinery and equipment to have been $131,970.22, and the total cost of improvements to leased property to have been $68,714.57. However, on the balance sheet at the end of the next fiscal year, June 30, 1957, about $50,000 of the machinery and equipment figure was shifted to improvements to leased property, without any explanatory note in the audit.

made: "Int. to 6/30, $1,552.50". A debit entry for cash in that amount appears under date of November 6, 1956, and entries of credits to interest and debits to cash appear through 1957, 1958, 1959 and 1960.[4]

On June 30, 1960, Smith advanced $52,000 to Wood Preserving so that it could pay the $50,000 Hathaway notes, and $2,000 interest due thereon. The cash advanced by Smith appears on the ledger account as a credit entry: "Cash, $52,000".

The first debit entry showing any payment on account of principal by Wood Preserving to Smith is on March 30, 1961, when Smith withdrew $3,375.68 from Wood Preserving, and paid the $3,375.68 to F. Bowie Smith & Son, Inc., to pay the balance which Smith owed that company on December 31, 1960. On August 14, 1961, Wood Preserving paid a premium on Smith's policy, which was entered as follows: "Cash—Sun Life Ins. Co. on account $119.40". Other payments of life insurance premiums for Smith were made during the fiscal year ending June 30, 1962, in the amount of $2,908.90, and between July 1, 1962 and January 14, 1963 in the amount of $2,781.65.

The payments on account of principal were made to Smith by Wood Preserving after the Internal Revenue Service had begun an audit of the books of Wood Preserving on December 28, 1960. The payment of $3,375.68 and the first payments of insurance premiums were made before the agent questioned the propriety of the "interest" deductions.

Under date of January 1, 1962, on the advice of a new accountant, Wood Preserving credited $45,000 to F. Bowie Smith & Son, Inc., and debited Smith's personal account. No payments on account of principal have been made to Smith since 1962 because the Internal Revenue Service contended that all such payments were taxable to Smith as ordinary income.

At the time he made the advances and the expenditures Smith did not expect to be repaid until Wood Preserving was operating on a profitable basis.

The company has not operated at a profit; its first year showed a loss, and it has just about broken even over the

4. The minutes of a special meeting of directors of Wood Preserving held on May 4, 1955, state:

"Mr. Smith was then requested by the Board to assist in the financing and to advise towards the completion of the plant, the Corporation agreeing to pay Mr. Smith 6% interest on open account and up to one-half of interest on bank loans."

The evidence shows that prior thereto, between January 1 and April 1, 1955, Smith had borrowed $225,000 from two banks, and that he borrowed $25,000 more on December 20, 1955.

Those borrowings cannot be tied into the advances and expenditures made by Smith to and for Wood Preserving. $225,000 of the $250,000 was borrowed before Wood Preserving was incorporated in April 1955, before the resolution of May 4, 1955, before Smith made any of the advances and expenditures, and at a time when, according to his own testimony, Smith did not believe that more than $60,000 would be needed to get Wood Preserving into operation. Smith testified that at the time Wood Preserving was organized and its plant purchased,

he thought it could be placed in operation by an expenditure of not more than $35,000 over the $25,000 paid to Wood Treating Company for the plant. The balance due on the plant was covered by five notes for $9,770 each, which were to be paid out of the cash flow from operations.

It seems probable from the entire evidence, including the ledger sheets of F. Bowie Smith & Son, Inc., now offered as exhibits by Wood Preserving, that most of the borrowings were not made for the purpose of advancing money to Wood Preserving but were tied into the numerous and large cash transactions which Smith engaged in with F. Bowie Smith & Son, Inc., and with the real estate transactions in which he was involved. No doubt the need to pour additional money into Wood Preserving prevented Smith from using to repay the banks sums he was receiving from F. Bowie Smith & Son, Inc., in 1955 and 1956.

Wood Preserving made some payments to the banks on account of the interest due by Smith, but the evidence does not show how they tie in either to Smith's borrowings from the banks or advances to Wood Preserving.

years. The net before taxes for the various years was as follows, in round figures: Year ending June 30, 1956, $18,-000 loss; 1957, $3,000 profit; 1958, $2,000 profit; 1959, $1,000 profit; 1960, $7,000 loss; 1961, $7,000 profit; 1962, $18,000 profit; and 1963, $5,000 loss.

In no annual report has Wood Preserving ever shown any surplus. The capital has always been offset by a surplus deficit, which on June 30, 1960, was $23,-628.73, with the result that the net worth at the end of the 1960 fiscal year was $1,371.27 while liabilities were $204,500.-50.

No reasonable banker or business man would have loaned Wood Preserving any money without personal endorsement or other security.

## Discussion

The development of the law dealing with the distinction between loans and capital contributions is discussed at length in 4 Mertens, Law of Federal Income Taxation, Zimet and Diamond Revision, § 26.10 to § 26.10c, ch. 26, pp. 37 to 67, and Vol. 4, Cum.Supp., pp. 449 to 460.[5] The following authorities state the principles which control the decision of this case: John Kelley Co. v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946); Gilbert v. C. I. R., 2 Cir., 262 F.2d 512 (1959); Dodd v. C. I. R., 4 Cir., 298 F.2d 570 (1962); Jewell Ridge Coal Corp. v. C. I. R., 4 Cir., 318 F.2d 695 (1963), and other Fourth Circuit cases cited therein. Some of the arguments advanced by Wood Preserving are based upon statements in opinions from other Circuits, particularly Rowan v. United States, 5 Cir., 219 F.2d 51 (1955), and Nassau Lens v. C. I. R., 2 Cir., 308 F.2d 39 (1962); those cases, however, are distinguishable on the facts and do not control this case. The authority of Byerlite Corp. v. Williams, 6 Cir., 286 F.2d 285 (1960), also cited by Wood Preserving, has been considerably weak-ened by Moughon v. C. I. R., 6 Cir., 329 F.2d 399 (1964).

The teaching of all the cases is that no one characteristic is decisive in determining whether obligations are risk investments or debts. The intention of the parties to the transaction in question is an important factor, but their intention should not be found from their testimony alone; all the surrounding circumstances must be considered. Some of the factors discussed in the authorities do not appear in the instant case, since there was no written instrument of any sort. All of the factors which are present do not point in one direction; they seldom do, and a court must decide which are the more important factors under all the circumstances. In this case, the Court is satisfied that the more important factors show that $128,500.11 [6] of the advancements were contributions to capital and not loans, especially since "the burden of establishing that the so-called advance was a loan is upon the taxpayer". Mertens, op. cit., § 26.10c, n. 62, 63, supp. n. 63.01, 63.02; Jewell Ridge Coal Corp. v. C. I. R., supra.

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income. While some variation from this formula is not fatal a great variation will preclude such treatment." Mertens, op. cit., § 26.10, citing Gregg Co. of Delaware v. Commissioner, 2 Cir., 239 F.2d 498 (1956); and Gilbert v. Commissioner, 2 Cir., 248 F.2d 399 (1957), and 262 F.2d 512 (1959).

Nomenclature, though relevant, is far from conclusive. Here, no instruments evidenced the advances, merely credit entries in a ledger, for "cash" or "expenditures" in the total amount of $156,000.11, offset only by the debit entry, "Sundries, Stock—$25,000" on July

---

5. See also Caplin, The Caloric Count of a Thin Incorporation, 17 Institute on Federal Taxation, N.Y.U., 1959, pp. 771 to 826.

6. All but the $2,500 advancement referred to in Note 2, above.

1, 1955.[7] There was no debit or credit entry for interest until June 30, 1956, when a credit entry of only $1,552.50 was made. The first debit entry for payment of interest was on November 6, 1956. Those entries do not accord with the minutes of May 4, 1955, which stated that Smith would be paid 6% interest on open account "and up to one-half of interest on bank loans" which Smith made in order to advance money to Wood Preserving.[8]

There was no fixed or ascertainable maturity date for any of the alleged loans. Many courts have considered a fixed or ascertainable maturity date to be an essential element of a creditor investment. See Mertens, op. cit., § 26.10a, n. 4, 5; § 26.10c, n. 54. It is a factor which should be considered here.

Smith made no effort to collect the principal of the alleged loan or any part thereof for over five years, until after the Internal Revenue Service had begun its audit. He did not act like a creditor. Mertens, op. cit., § 26.10c, n. 52, 53.

The books of Wood Preserving always showed a negative surplus, which during all relevant periods almost wiped out the original $25,000 capital. In view of its indebtedness to persons and corporations other than Smith, it is clear that Wood Preserving itself could not have borrowed money from any reasonable banker or business man on its own credit. A stockholder is not required to be as hard-nosed as a banker; but the evidence is conclusive that Smith, who was the sole stockholder of Wood Preserving, could look only to the possible profits of the venture for a return of the money which he advanced, and continued to advance in the face of ever-increasing difficulties, to purchase, install and build a plant for the corporation, to enable the company to begin operations, and to sustain its daily operations over the period before it began to earn even a modest profit. The cash flow resulting from depreciation, suggested by taxpayer's attorney as a possible source of repayment, was bound to be used up, in large part at least, in paying the notes, totaling nearly $50,000 given to the vendor of the plant.

The "thin incorporation" doctrine has developed as a result of a comment made by the Supreme Court in the Kelley case, 326 U.S. at 526, 66 S.Ct. at 302, 90 L.Ed. 278. No ratio applicable in every case has been or should be fixed. In the instant case, the amount of the claimed loans, together with the Hathaway notes and other liabilities, compared to the amount of the capital stock, even ignoring the deficit, indicates a high debt-equity ratio. That is a factor to be considered.

Applying to the facts of this case the principles stated in the Kelley, Gilbert, Dodd, Jewell Ridge, and Moughon cases, supra, as well as in the Mertens text and the Caplin article, the Court concludes that $128,500.11 of the advances made during the 1955 and 1956 fiscal years[9] were properly held by the Commissioner to be contributions to capital and not loans, and that Wood Preserving has not met the burden resting upon it to show that it is entitled to the claimed deductions for interest on those items.[10]

7. Aside from the $2,500 debit matching the $2,500 credit of April 12, 1956. See Note 2, above.

8. Some such payments to the bank were made, but the evidence does not tie them into Smith's borrowings from the banks or his advances to Wood Preserving. See Note 4, above. The Court has found that most of the borrowings were made by Smith for other purposes.

9. I.e., all but the $2,500 item referred to in Note 2, above.

10. In the spring of 1955, when Smith hoped that Wood Preserving would be able to begin operations with a balance sheet showing as assets the plant, $74,080, plus other machinery, equipment, improvements to the leased land, together with the cash necessary to begin operations, amounting to another $35,000, a total of about $110,000, matched by $25,000 capital stock, $49,080 notes due the vendor of the plant, and $35,000 from Smith, there might have been an argument for saying that the corporation had some borrowing power and for treating

### 3–B.

*The $52,000 Advance on June 30, 1960*

With respect to the $52,000 advanced on June 30, 1960, the Court has found the following facts. An agreement had been made with Hathaway by which Hathaway was to render certain services. For those services, Hathaway was to receive $10,000 a year plus a share of the gross profits before taxes. When Hathaway did not do what he was supposed to do, a settlement was made under which he was to receive $10,000 a year for five years but no share of the profits. It was also agreed that Wood Preserving should have the right to pay the five $10,000 items in notes maturing on June 30, 1960, the notes to be endorsed by F. Bowie Smith & Son, Inc., the lumber company. Wood Preserving took advantage of this provision and five $10,000 notes, payable June 30, 1960, were issued and endorsed. When the $50,000 of notes, plus $2,000 interest, came due on June 30, 1960, Wood Preserving had no money to pay them. Instead of the lumber company taking them up, as it was obligated to do, Smith advanced the money to pay them. He did not pay the creditor and take an assignment of the notes, as he might have done, but gave his check for $52,000 to Wood Preserving and Wood Preserving gave its check to Hathaway. There was no increase in the indebtedness of Wood Preserving. From its point of view, the situation was exactly the same as if Smith had bought the notes from Hathaway.

A year or so later, when Wood Preserving engaged a new accountant, he worked out a transaction by which, in effect, $45,000 was debited on Wood Preserving's books as having been paid to Smith and a similar amount was credited against the indebtedness of the lumber company to Wood Preserving. This came pretty close to making the $52,000 transaction what it should have been all along, namely, the lumber company putting up the money as endorser of the notes.

On these facts, it seems only fair to hold that the $52,000 advanced on June 30, 1960, should be treated as a loan and not as a contribution to capital. Interest at the rate of 6% per annum thereon should be allowed as a deduction.[11]

the $35,000 of expected advances by Smith as a loan, *if* the transactions had been properly set up as loan transactions. But after it became apparent in the summer of 1955 that much more money would have to be poured into Wood Preserving to complete its plant and to enable it to start operations, it is clear that no one would have advanced any money to it except its stockholder, who was willing to put up more money in order to save the investment he had already made, and to obtain the advantages to his lumber company and to himself as owner of the land which would result from the operations of Wood Preserving. Those advances and expenditures constitute by far the larger part of the $128,500.11.

The Court reiterates the suggestion, made after the trial and again after the hearing on the motion for new trial, that this is a case which ought to be settled by Smith and the Internal Revenue Service, taking into account all relevant years for both taxpayers, Smith and Wood Preserving, and for F. Bowie Smith & Son, Inc., as well, if its tax liability is involved in any of the transactions. It is nearly impossible for a Court to achieve a fair result when dealing with only a part of the problem. The Court can merely apply the law to the facts as it finds them, and decide the issues before it.

11. Although it is not directly before the Court in this case, the Court reiterates its opinion stated orally immediately after the hearing: that until the $52,000 advanced on June 30, 1960 (which the Court has found to have been a loan) is entirely wiped out by the $45,000 entry and by other payments on account of principal, such payments should be considered as repayments on account of the $52,000 loan, and not as repayments of the $128,500.11 found by the Court to have been capital contributions.

The Court does not intimate that some or all of the payments in 1961 and 1962 should be treated as dividends. That question is not before the Court. Various factors, including whether there were any net profits or surplus out of which a dividend could properly have been paid, should be considered in determining whether each such payment was a dividend or a return of capital.