S.P. Realty Co., Inc. v. Commissioner.
S. P. Realty Co. v. Commissioner
Docket No. 831-67.
United States Tax Court
T.C. Memo 1968-156; 1968 Tax Ct. Memo LEXIS 143; 27 T.C.M. (CCH) 764; T.C.M. (RIA) 68156; July 23, 1968. Filed Robert K. Hartmann, Hasbrouck Hts., N.J., for the petitioner. Owen A. Knopping, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies against the petitioner: Taxable Year Ended
Deficiency
June 30, 1962
$2,091.78
June 30, 1963
1,552.50
June 30, 1964
1,437.69
The only issue for decision is whether certain advances made to petitioner by its three shareholders were contributions to capital or loans entitling petitioner to deduct the interest paid or accrued during the years here involved. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein *144 by this reference. S.P. Realty Company, Inc. (herein called petitioner) is a New Jersey Corporation which at the time the petition was filed in this proceeding had its principal place of business in Hasbrouck Heights, New Jersey. It filed its United States corporation income tax returns for the fiscal years ended June 30, 1962, 1963 and 1964 with the district director of internal revenue at Newark, New Jersey. Petitioner was incorporated in 1955 by John Peterson (herein called Peterson) and William Speros (herein called Speros) for the purpose of acquiring land and constructing a Howard Johnson restaurant thereon. Shortly after its incorporation, Peter Kalliches (herein called Kalliches) became a shareholder of petitioner. Peterson and Kalliches each own two shares of petitioner's stock and Speros owns four shares. Upon completion of the restaurant building, it was leased to H & L Enterprises, Inc. (herein called H & L), a related entity also owned by Kalliches, Peterson and Speros. When H & L started business in November 1956, its only assets were furniture and fixtures which were purchased by funds advanced to it by the petitioner. H & L had no credit rating of its own and *145 had to rely on the petitioner for all necessary financing. The rental agreement between H & L and petitioner provided for the payment of rent on a graduated basis which was $700 a month in 1956, $1,000 per month in 1958, $1,250 per month in 1961, and $1,500 per month in 1964. Petitioner's only source of income was the rental payments received from H & L. 765 The purchase of the land and construction of the building occurred sometime between the end of 1955 and the beginning of 1956. The initial cost to petitioner was $35,000 for the land, $97,000 for the construction of the building, and $3,000 for the Howard Johnson franchise. As of January 1956, it was apparent to all the interested parties that the business would require approximately $100,000 in addition to a $65,000 loan being negotiated with Bankers National Life Insurance Company (herein called Bankers) to acquire the land and construct the building. Consequently, the shareholders adopted a resolution authorizing petitioner to borrow necessary funds from them and the $65,000 from Bankers. This resolution was adopted only after unsuccessful attempts had been made to obtain additional funds from outside lending institutions. *146 Petitioner could have obtained funds from these outside sources but only at interest rates between 10 and 12 percent. The shareholders considered these rates too high and decided to advance petitioner money "as the corporation needed it." Petitioner was also authorized, pursuant to the resolution, to execute evidence of indebtedness in the form of demand notes having an interest rate of 5 percent annually. Petitioner received the $65,000 loan from Bankers sometime in the latter part of 1956. Pursuant to the loan agreement, it paid Bankers quarterly installments of principal in the amount of $1,625 plus quarterly installments of interest on the remaining balance at the rate of 6 percent annually. The loan, though received subsequent to some of the advances from the shareholders, was secured by a first mortgage on the land and building as well as by a chattel mortgage on furniture, fixtures, equipment, and machinery. Peterson and Speros were also required to personally guarantee its repayment. It matured on November 1, 1966, at which time it had been paid in full. As of the end of petitioner's first taxable year, June 30, 1956, the following amounts of money had been advanced to *147 petitioner: $15,000 by Kalliches, $30,000 by Speros, and $15,000 by Peterson. All these advances were originally designated and carried on petitioner's books as loans from the shareholders. The shareholders made no provision for a capital account until the end of petitioner's first taxable year, June 30, 1956. At that time the three shareholders, on the advice of petitioner's accountant, established a capital account by transferring $4,000 from the shareholders' loan account to the newly created capital account. Kalliches and Peterson each received a 25 percent proprietary interest for $1,000 represented by two shares of capital stock and Speros received a 50 percent interest, or two shares of capital stock, for his contribution of $2,000. No money was actually given to petitioner at that time. Only the shareholders' loan account was debited for the proper amount and the capital account was credited. The advances from the three shareholders increased during the taxable year ended June 30, 1958, * so that by the end of the year the total advances were as follows: $26,500 from Kalliches, $26,500 from Peterson, and $53,000 from Speros. The ratio of shareholder advances designated as *148 loans to the advances designated as capital, exclusive of the $65,000 loan from Bankers, was 26.5 to 1. The ratio, including the outside loan, was 42.5 to 1. At the beginning of petitioner's 1962 taxable year, the capital account remained at $4,000 and the shareholders loan account had increased to $113,000. However, by the end of that year, the capital account was increased to $20,000. The increase of $16,000 was accomplished by Kalliches and Peterson each contributing $2,500 and Speros $5,000 with their respective loan accounts debited for the remaining $6,000. This increase in the capital account, like all the other "advances" made by the shareholders, was made in the same proportion to their original capital investment. The value of the land and building had increased during this period. Although petitioner carried these assets on its books at a value of $129,982, they were worth at least $173,000. In addition, petitioner was receiving rent from H & L in the amount of $1,250 and had paid off approximately two-thirds of the balance due on *149 the debt to Bankers. At the end of the 1964 taxable year, the capital account remained at $20,000 and the shareholders' loan account stood at $107,000. While the advances were carried on petitioner's books as loans, no interest was paid on them prior to the taxable year ended June 30, 1958, when for the first time interest was accrued. In 1965, petitioner's returns were audited by a revenue agent, who 766 questioned the authenticity of the advances as loans. Shortly after the audit, petitioner made partial payments of $7,000 and $20,000 on the principal of the demand notes. In its corporate income tax return for the taxable year ended June 30, 1961, petitioner claimed an interest deduction of $5,300 on the advances received from the shareholders, and a net operating loss of $3,990.54. As a result of a carryover of this claimed net operating loss, petitioner claimed a net operating loss deduction for the taxable year ended June 30, 1962, in the amount of $3,990.54. In its corporate tax returns for the taxable years ended June 30, 1962, June 30, 1963, and June 30, 1964, the petitioner claimed deductions of $5,350, $5,175, and $5,525, respectively, for interest paid on the *150 "advances" received from the shareholders. Respondent disallowed the claimed net operating loss for the taxable year 1962 and the interest deductions for the taxable years 1962 through 1964. Opinion The only issue is whether advances in the amount of $107,000 to the petitioner by its three shareholders were contributions to capital, as respondent contends, or loans entitling the petitioner to deduct the interest paid or accrued under section 163(a), Internal Revenue Code of 1954, as petitioner contends. It is well established that this question, essentially a factual one, must be determined on the basis of all the facts and circumstances of each case, with no single factor being determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408(1954); C.M. Gooch Lumber Sales Co., 49 T.C. 649 (1968), on appeal (C.A. 6); and Malone & Hyde, Inc., 49 T.C. 575 (1968). Transactions allegedly giving rise to a creditor-debtor relationship between shareholders and their controlled corporation must be closely *151 scrutinized to ascertain if such a relationship was in fact created. C.M. Gooch Lumber Sales Co., supra. Formal manifestations of the interested parties carry little weight in these particular circumstances because the shareholders of a closely-held corporation can always refrain from asserting their strict legal rights as creditors. Fin Hay Realty Co. v. United States, 398 F. 2d 694 (C.A. 3, June 20, 1968), affirming, 261 F. Supp. 823 (D.C.N.J. 1966). Since "things are seldom what they seem," the substance and not the form of the transaction will determine whether the shareholder advances here are to be treated, for Federal tax purposes, as debt or equity. Charter Wire, Inc. v. United States, 309 F. 2d (C.A. 7, 1962); and Ambassador Apartments, Inc., 50 T.C. No. 23 (May 6, 1968). Petitioner claims that the demand notes dated June 30, 1958, were actually executed on that date. In view of the evidence presented, petitioner has not convinced us of that fact. The notes were not shown to the revenue agent, who at the time of the audit, asked petitioner's accountant and Kalliches if the advances were represented by any evidence of *152 indebtedness. Both of them replied in the negative. It is difficult for us to believe that the notes were in existence in 1964 and were not shown to the revenue agent. And it seems unlikely that subsequently Kalliches just happened to come across the notes in his safe deposit box and still did not inform respondent's agent of his discovery until the hearing in this case. The failure to issue any formal evidence of indebtedness, however, is not fatal to petitioner's contention. "Formal evidences of indebtedness are at best clues to proof of the ultimate fact." C.M. Gooch Lumber Sales Co., supra at p. 656. See also Wachovia Bank and Trust Co. v. United States 288 F. 2d 750 (C.A. 4, 1961); and Byerlite Corporation v. Williams, 286 F. 2d 285, 290 (C.A. 6, 1960). The advances were labeled "loans" by the resolution authorizing petitioner to borrow money and by its corporate books, both of which are indicative of the objective * intent of the parties that the advances were to be treated as loans. However, just as we must go behing the form of the transaction to its substance, we must also took beyond the objective * intent of the parties to determine *153 their subjective * intent from all the relevant circumstances. Wood Preserving Corporation of Baltimore v. 767 United States, 233 F. Supp. 600 (D.C. Md. 1964), affd. 347 F. 2d 117 (C.A. 4, 1965). Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." To qualify for the claimed interest deductions the petitioner must establish the existence of an "indebtedness." It is significant that the purported debts were held by the three shareholders in the same proportion as their stock. Where, as here, advances are made by shareholders of a closely-held corporation in proportion to their stockholdings, a strong inference is created that the advances represent additional equity capital and not indebtedness. Arlington Park Jockey Club v. Sauber, 262 F. 2d 902 (C.A. 7, 1959); Sam Schnitzer, 13 T.C. 43 (1949), *154 affirmed per curiam 183 F. 2d 70 (C.A. 9, 1950). Kalliches, Peterson, and Speros carefully maintained the advances in proportion to their proprietary interests. This is evidenced by the bookkeeping entries to equalize their accounts. The shareholders arbitrarily designated as loans the major portion of the initial capital. This, too, is an indication that the entire amount is a contribution to capital. Fin Hay Realty Corporation v. United States, supra; Burr Oaks Corporation v. Commissioner, 365 F. 2d 24 (C.A. 7, 1966), affirming 43 T.C. 635 (1965); Alfred R. Bachrach 18 T.C. 479 (1952), affirmed per curiam 205 F. 2d 151 (C.A. 2, 1953). The parties knew as early as January 1956 that the proposed venture would require at least $100,000 in addition to the $65,000 loan from Bankers. Yet they waited until June 30, 1956, to establish a capital account and then only in the amount of $4,000. Kalliches testified that all the advances were in the form of loans and that the capital account was created by bookkeeping entries which transferred $4,000 from the shareholders loan account to the capital account. As it *155 turned out, the shareholders were required to advance petitioner $107,000 in addition to the capital of $4,000 needed for the acquisition of the property and the construction of the restaurant. * In order to acquire the basic assets of its business, petitioner required funds totaling over 42 times its capital. The ratio of shareholder held debt to equity was 26.5 to 1. If the $65,000 mortgage indebtedness were included, the petitioner's ratio of debt to equity would be approximately 42.5 to 1. Under either method of computation, the ratio of debt to equity was excessive. Isidor Dobkin, 15 T.C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951). It is plain that petitioner was thinly incorporated. Another indication that the advances lacked the substance of indebtedness is the inability of petitioner to obtain needed funds from outside sources on comparable terms. Fin Hay Realty Corporation v. United States, supra; O.H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 *156 (C.A. 9, 1960); Erard A. Matthiessen, 16 T.C. 781 (1951), affd. 194 F. 2d 659 (C.A. 2, 1952). No outside lender would have made a loan in the amount of $107,000 on an unsound demand note with interest at 5 percent. Testimony elicited from one of petitioner's witnesses showed that petitioner could only obtain the needed money from outside lenders at interest rates between 10 and 12 percent. The inference we draw from the petitioner's inability to obtain financing, except at such high interest rates, is that no prudent businessman would have risked his capital in 5 percent unsecured demand notes in petitioner for the years 1956 and 1957. A cursory comparison of the terms of the $65,000 loan from Bankers with the terms of the advances from the shareholders readily reveals the substantiality of the risk attaching to the advances in contrast to the relative security of the bank loan. It is also noteworthy that petitioner paid the $65,000 debt to Bankers, but made no payments on the principal of the demand notes for over seven years, and then only after their authenticity was questioned. See Atlanta Biltmore Hotel Corporation v. Commissioner, 349 F. 2d 677, 680 *157 (C.A. 5, 1965), affirming a Memorandum Opinion of this Court; and O.H. Kruse Grain & Milling v. Commissioner, supra. Unlike the outside loan, the demand notes contained no provision for retirement. General Alloy Casting Co. v. Commissioner, 345 F. 2d 794 (C.A. 3, 1965), affirming per curiam a Memorandum Opinion of this Court. Furthermore, petitioner failed to pay any interest on the notes for the taxable years 768 ended June 30, 1956, and June 30, 1957, a fact inconsistent with the creation of a genuine debtor-creditor relationship. Finally, petitioner has not shown that the advances were made with the expectation of repayment regardless of the success of the venture. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959); C. M. Gooch Lumber Sales Co., supra; and Malone & Hyde, Inc., supra. The inadequate capital contribution and the dependency upon future earnings for repayment demonstrate that the shareholders, so far as the advances were concerned, were inextricably locked into the business, sharing its profits and losses. The evidence overwhelmingly compels the conclusion that the advances, when made, were contributions *158 to capital, and petitioner has not established any change in their character. The nature of the advances was not changed simply because the business subsequently proved successful and the real property increased in value. Fin Hay Realty Corporation v. United States, supra. Accordingly, in view of these facts and circumstances, we conclude that the advances were capital contributions and that respondent correctly disallowed the claimed interest deductions for the years in question. Decision will be entered for the respondent. Footnotes
*. By official Tax Court order dated 7-31-68, and signed by Judge Dawson↩, Jr., the year 1958 was substituted for the year 1956. - CCH.
*. By official Tax Court order, dated 7-31-68, and signed by Judge Dawson↩, Jr., the word "objective" was substituted for the word "subjective" in the 5th and 6th sentences in paragraph four of the Opinion; the word "subjective" was substituted for the word "real" in above-mentioned sentence six. - CCH.
*. By official Tax Court order, dated 7-31-68, and signed by Judge Dawson↩, Jr., this paragraph was substituted for the original paragraph. - CCH.