Paul W. BOYLES and Dorothy
H. Boyles, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 1:99CV00132.

United States District Court,
M.D. North Carolina.

Aug. 6, 2001.

Mathew E. Bates, Greensboro, NC, for plaintiffs.

U.S. Attorney, Office of U.S. Attorney, Greensboro, NC, Christopher J. Kayser, U.S. Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

ELIASON, United States Magistrate Judge.

Plaintiffs, who are husband and wife, filed this lawsuit alleging that they should receive refunds of certain taxes paid by them following an audit by the Internal Revenue Service of their personal taxes. That audit concluded that expenses had been paid for plaintiffs by a corporation owned by plaintiff Dr. Paul Boyles and that these payments were taxable dividends. Plaintiffs contend that the tax paid on these dividends should be refunded because the dividends were actually repayments on loans they had made to the corporation. A bench trial was conducted on May 2, 2001, and the matter is now before the Court for a final decision. After hearing the witnesses and reviewing the exhibits and record, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. In 1974, Dr. Boyles formed a corporation called Triangle Medical Diagnosis & Therapy, Inc. (hereinafter Triangle). It was a personal service corporation wherein Dr. Boyles or other physicians rendered medical services. Dorothy Boyles, for at least some period of time, served as the office manager. Dr. Boyles paid $300 for his stock and was the sole shareholder in Triangle. The small initial payment means that Triangle was under capitalized.

2. Around the same time as Triangle was formed, Dr. Boyles also formed a second corporation called 315 South Academy Street, Inc. (hereinafter 315). This corporation owned a building bearing the same address as its name and leased that building to Triangle for Triangle's offices. In 1988, 315 declared bankruptcy. At that point, Triangle bought the building from 315.

3. Dr. Boyles claims that he put over $500,000 of his and Dorothy's money into Triangle both at startup and at later times. Dorothy Boyles testified that the company was frequently short of money to pay salaries, so she would take money from their personal account and put it into the corporation. However, she has no recollection as to the times or amounts. Dr. Boyles testified that the money was used to renovate the building at 315 South Academy Street and to buy equipment for Triangle. However, plaintiffs do not have any documentation to support this claim relating to such large sums of money. Further, a corporate tax return filled out by Dr. Boyles and filed by Triangle for the 1988 tax year (defendant's Exhibit 5) lists assets of either $500 or "none" depending on how the form is read or which line is examined.[1] Dr. Boyles admits that Triangle had assets, such as medical equipment, but does not remember why no other assets were listed or what happened to the assets. He would appear to agree that most of whatever sum of money he put into Triangle constituted capital contributions rather than loans.

4. Plaintiffs claim that, over a period of years, they loaned Triangle sizeable sums of money which totaled over $124,000 by 1985. With the exception of their own testimony, the testimony of one of their

---

1. It also lists rent paid as $30,000, yet the evidence shows that Triangle did not pay rent.

prior accountants that he remembered loans being recorded on Triangle's books, and an accounting report (defendant's Exhibit 1) for the year 1985, plaintiffs have produced no proof of the loans. The accounting report shows $124,770 in loans to officers being carried on Triangle's books at the end of 1985. However, the assets only amount to $200,000. If plaintiffs put in $500,000 with present assets of $200,000, they had no explanation as to what happened to the other $300,000 in loans. This raises questions about the legitimacy or accuracies of the figures. The weight of the accounting report is further reduced by the fact that the numbers in it were not the result of an independent audit by an accountant, but were instead a CPA's summarization of the numbers recorded in Triangle's books. Triangle's books were kept by Dorothy Boyles, who now has little, if any, recollection of what went on.

5. Dr. Boyles admits that the alleged loans were made without a written instrument, had no predetermined interest rate, had no fixed maturity period, did not have scheduled payments, and were used mainly to buy new equipment which he expected would make Triangle more profitable.[2] Dr. Boyles also testified that no financing statements were ever filed with any state agencies.

6. During 1988, both 315 and Dr. Boyles filed for bankruptcy. For at least some portions of 1988 and 1989, Triangle paid for Dr. Boyles' personal expenses such as his mortgage payment, utilities bills, and country club dues. It is these payments that the government claims were dividends and plaintiffs claim were loan repayments.

7. Dr. Boyles testified that he drew no salary from Triangle during 1988 and 1989 due to Triangle's poor financial condition.

This is apparently supported by Triangle's 1988 tax return which Dr. Boyles completed and signed under penalty of perjury. That return lists $387 as having been paid out in salary and wages during 1988. Plaintiffs' personal tax return for 1988 lists $26,800 in salary and wages. This amount reflected money received from a separate job that Dr. Boyles took outside of his work at Triangle. However, Dr. Boyles' testimony and his personal tax return is contradicted by his bankruptcy petition which was also signed by him under penalty of perjury and which lists his monthly take home salary in 1988 as being $3,508.

8. In 1990, Triangle filed for bankruptcy. As a result, all of its books and records, with the apparent exception of a few random documents which mistakenly remained in Dr. Boyles' possession, were given to the bankruptcy trustee Holmes Harden. No preference letters were issued regarding payments to insiders in the corporation. Harden is unsure at this time whether no letters were issued because none were appropriate or because there was no business reason to issue such letters given that substantially all of Triangle's debts were paid during its bankruptcy. However, he testified that had he known about the corporation's payment of plaintiffs' personal bills, he would have considered these payments to have been a fraudulent transfer of assets under bankruptcy law. Following the end of Triangle's bankruptcy proceedings, a court order was issued stating that Harden was to offer the documents to (1) the Internal Revenue Service, (2) the North Carolina Department of Revenue, and (3) Triangle or its attorney. If no one accepted the records, they were to be destroyed after thirty days had elapsed from the date of

---

**2.** As noted before, Dorothy Boyles testified that, from her perspective, the alleged loans were used to help Triangle meet its payroll obligations.

the order. Harden believes that the records were probably destroyed.

9. Dr. Boyles received the notification from Harden prior to the thirty-day period, but failed to contact Harden's office until more than thirty days after receiving the court order concerning Triangle's records. By then, he was informed that the records had been destroyed.

10. From the above facts and the below listed considerations, the Court finds that overall, Dr. Boyles exhibited a careless and cavalier attitude in conducting both his personal and business finances and generally disregarded the corporate forms that he created. Whether by design or through inadvertence, his conduct in this regard does not match with his education, intelligence, or the sophistication that he showed in structuring his affairs at the time he set up his corporations. In addition to the discrepancies already noted between his personal and business tax returns, bankruptcy petition, and his lack of documentation for his alleged loans and contributions to Triangle, other similar occurrences emerged during Dr. Boyles testimony. They are:

(a) Dr. Boyles admitted at one point on the witness stand that he owned a one half interest in his and his wife's house, 3 acres of real estate in Arizona, and 22 acres in Moore County, North Carolina, at the time of his bankruptcy. Despite this, he listed no real estate on his personal bankruptcy petition. Later, Dr. Boyles also testified that his residence and the Moore County property had been through various title changes over the years and were in his wife's name at the time of his bankruptcy. He stated that this was due to the fact that his ex-wife took him to court on a regular basis for almost three decades. Even this explanation does not account for the Arizona property.

(b) Dr. Boyles failed to list the alleged loans made to Triangle as assets on his personal bankruptcy petition.

(c) Triangle's bankruptcy petition, which was prepared by Dr. Boyles, did not list plaintiffs as creditors in its bankruptcy petition, despite having the alleged loans from plaintiffs supposedly recorded in its books. As noted by Mr. Harden, the repayment of the alleged loans by paying plaintiffs' personal debts would have serious implications in the bankruptcy proceeding. One wonders if plaintiffs contend the alleged loans even survived bankruptcy.

(d) Triangle's corporate tax return for 1988 listed $85,000 in bad debt deductions. This deduction should not have been taken because, as Dr. Boyles testified, Triangle worked on a cash accounting system and the $85,000 in unpaid patient bills had not been added into Triangle's income on the tax return in the first instance. Therefore, a bad debt could not have been deducted. Thus, the entry, at best, is improper.

(e) Moreover, this same corporate tax return for 1988 was marked as an initial return. However, Dr. Boyles testified that Triangle had filed tax returns every year and that he did not know why the return was designated as an initial return.

(f) In 1984, a loan for $24,100.79 was made by Central Carolina Bank and Trust Company, National Association. Despite the fact that the loan form clearly lists 315 as the borrower with plaintiffs signing on the loan, Dr. Boyles cannot remember whether this loan might actually have been reflected on Triangle's books and recorded in the accountant's Compilation Report for Triangle in 1985 as a $23,894.42 liability.

(g) Despite allegedly leasing its building from 315, Triangle never paid rent to 315 on a regular basis. Yet, Triangle claimed

to have paid $30,000 in rent in the 1988 tax return.

(h) Dr. Boyles paid off all of his creditors following his personal bankruptcy through a series of monthly payments. When asked on the witness stand how he made these payments, he gave no source for the funds and only stated that it was "difficult."

11. Steve Lothar, an employee of the Internal Revenue Service, conducted an audit of plaintiffs which ended in July of 1991. His testimony regarding the audit established the following:

(a) Despite the passage of almost ten years, Lothar remembers the audit because plaintiffs were very uncooperative. Dr. Boyles refused to meet with Lothar or provide him with records that he requested, including Triangle's books.[3]

(b) Lothar was eventually forced to resort to the rare tactic of summonsing plaintiffs' bank records. It was from the bank records that he learned about the payment of plaintiffs' personal expenses by Triangle. He also worked with someone who had power of attorney for plaintiffs.

(c) Based on this work, issues soon arose over whether all of the deductions claimed by plaintiffs were proper and whether all of the income they received had been reported on their tax returns.

(d) In resolving these issues, Lothar eventually allowed some of plaintiffs' deductions and disallowed others. He also concluded that the payments of plaintiffs' personal expenses by Triangle in 1988 and 1989 were dividends paid as a return on capital which constituted unreported taxable income. Plaintiffs contended, and continue to maintain, that these payments

were repayments of their loans to Triangle. Lothar described this in his report as fraud and assessed a fraud penalty.

13. Following Lothar's audit of plaintiffs, the Internal Revenue Service issued assessments against plaintiffs for $20,731.99 in tax, penalties, and interest for tax year 1988 and $36,276.43 in tax, penalties, and interest for tax year 1989. Plaintiffs paid these amounts, but later filed claims to have them refunded. The Internal Revenue Service abated and refunded $545.00 of negligence penalty for 1988. It reduced plaintiffs' tax liability by $3,176.00 for 1989 and also adjusted an accuracy penalty for that year by $3,747.00. It disallowed plaintiffs' claims for refunds on the remaining amounts.

14. Defendant's files containing the records from Lothar's audit have been destroyed or are otherwise beyond retrieval.

### Conclusions of Law

The tax code treats returns on equity and repayments of debt in very different ways. A detailed discussion of the topic is not necessary. Rather, for the purposes of this decision, it is sufficient to say that, generally speaking, returns on equity are treated as taxable income, while repayments of debt are not (unless they are for interest on a debt). *Slappey Drive Industrial Park v. United States*, 561 F.2d 572, 580 (5th Cir.1977). Despite this seeming simple distinction as far as their tax treatment, determining whether an amount of money given to a corporation is debt or equity can be deceptively difficult, particularly where a close corporation and its shareholders are involved. *Id.*

---

**3.** Dr. Boyles explains the lack of records by stating that the bankruptcy trustee had Triangle's records at that time. It appears that this was so. However, Dr. Boyles was clearly given an opportunity to retrieve the records, but failed to do so. No convincing explanation was given for failing to meet with Lothar.

Plaintiffs claim that they made large contributions to Triangle. They agree that some of these contributions were capital or equity contributions. However, they characterize others of these contributions as loans to Triangle. When defendant audited plaintiffs personal taxes for the years 1988 and 1989, it found that Triangle had paid plaintiffs' mortgage, utilities, and country club dues. Defendant taxed plaintiffs on these payments on the ground that they were returns on capital rather than loan repayments as plaintiffs claimed. Plaintiffs continue to claim that the payments were loan repayments and seek a refund on that basis. It is plaintiffs' burden to prove that the payments were repayments made pursuant to a valid loan. *Schaefer v. Commissioner*, 68 T.C.M. (CCH) 655 (1994).

Whether a contribution to a closely held corporation by a shareholder is a loan or a capital contribution turns on the intent of the corporation and shareholder. *Wood Preserving Corp. of Baltimore v. United States*, 347 F.2d 117 (4th Cir.1965). However, while the testimony of the shareholder is relevant to this consideration, other relevant circumstances surrounding the transaction must also be examined. *Id.* at 119. In the end, it is the parties' intent as shown by these objective circumstances which controls whether a money infused into a corporation was a capital contribution or a loan.

Over time, courts have identified a number of recurring factors which help in distinguishing between capital contributions and loans. Some of these factors

which are relevant to the case at bar are the nature of any instrument evidencing or creating the debt, the presence or absence of a fixed interest rate and scheduled payments, whether there was an obligation by the corporation to pay whether or not it earned a profit, how the contributions were used by the corporation, how the contributions were carried on the corporation's books, and the business purpose behind the transaction. *Id.* at 119–120; *Schaefer*, 68 T.C.M. (CCH) 655; *Murphy v. Commissioner*, 21 T.C.M. (CCH) 1161 (1962). This list is non-exclusive and any other facts relevant to a particular case may also be considered.

In the present case, almost all of the factors listed above, as well as other facts in the record, point to the conclusion that none of plaintiffs' contributions to Triangle were loans. Therefore, any payments from Triangle to plaintiffs would not have constituted loan repayments and were properly characterized by defendant as returns on capital contributions.[4]

Here, the alleged loans from plaintiffs to Triangle were not evidenced by any instrument. They had no rate of interest, no fixed maturity date, and no set payments. They were used by the corporation to buy capital equipment, which plaintiffs did not take a security interest in, and, possibly, to meet the payroll. Dr. Boyles expected the new equipment to pay for itself by increasing the corporation's income. Because of the lack of any treatment of the contributions of money as loans, they look like infusions of capital intended to increase the profits of a closely held corporation so that the stockholder could benefit.

---

4. In one sense, plaintiffs were fortunate in the way that defendant characterized the payments from Triangle. Lothar testified that, due to the nature of the payments and the fact that Dr. Boyles allegedly drew no salary from Triangle at the time the payments were made, he would likely characterize the payments as salary, rather than dividends, if he were conducting the audit at the present time. He testified that this would have resulted in even less favorable tax treatment for plaintiffs than did his characterization of the money as dividends.

The only standard factor which weighs in plaintiffs' favor is that Triangle apparently did carry some of the contributions as loans on its books. However, this factor is weakened by certain facts. First, the books were kept by one of the plaintiffs, Dorothy Boyles. Second, and most importantly, Dr. Boyles has habitually listed numbers on documents which suited his needs at one time only to write different numbers to suit his needs at later times. This is reflected by the fairly large number of discrepancies found between his testimony, plaintiffs' 1988 personal tax return, Triangle's 1988 tax return, Dr. Boyles bankruptcy petition, and Triangle's bankruptcy petition. Each of the documents contain numbers which are to his advantage at the time they were recorded, but which are contradicted by his testimony or other documents. Therefore, the fact that plaintiffs themselves recorded some of their contributions as loans in Triangle's books carries little, if any, weight in determining the true nature of the contributions.

Finally, other factors in the record also weigh against the contributions being loans. Chief among these is the nature of the payments from Triangle to plaintiffs. Repayments of business loans ordinarily involve transfers of set sums of money. Here, Triangle did not give plaintiffs a check each month for a set amount. Instead, it simply covered some of their personal expenses in amounts which did not match with the amounts of loans that Triangle purportedly carried on its books. It did so at a time when plaintiffs, at least one of whom has a history of characterizing (or mischaracterizing) numbers as needed, would have been in dire financial straits due to Dr. Boyles' bankruptcy.

Also, as previously noted, the fact that Dr. Boyles was not drawing a salary from Triangle suggests that the payments were actually made in lieu of salary and could well have been counted as salary income. The timing of the alleged repayments creates a problem as well. According to plaintiffs' testimony, the so-called loans had been on Triangle's books for years before any repayments occurred. If a party were going to make a no interest, unsecured loan, certainly such a loan would be expected to be repaid quickly, perhaps in only days, rather than years. In sum, it appears that plaintiffs disregarded most corporate financial formalities and treated the corporation as their own personal vehicle, switching money and figures at will to suit their then present needs. Under such circumstances, plaintiffs cannot hope to meet their burden of showing the payments were and should be treated as loans.

In their trial brief, plaintiffs argue that their situation is similar to the facts of *Wood Preserving Corp. of Baltimore v. United States*, 233 F.Supp. 600 (D.Md. 1964), *aff'd*, 347 F.2d 117 (4th Cir.1965), and *Schaefer v. Commissioner of Revenue*, 68 T.C.M. (CCH) 655 (1994). While in some respects this is true, the nature of the payments in plaintiffs' situation provides a critical difference. First, in *Wood Preserving*, the court found most of the advances to be contributions to capital because of lack of instruments, terms, maturity dates, etc. One amount in *Wood Preserving* and the advances in *Schaefer* were found by the courts to be repayments of loans, rather than dividends. However, both courts specifically based their decision on the grounds that the repayments substantially erased the amount of a specific prior corporate indebtedness.[5] This

---

5. In *Schaefer v. Commissioner of Revenue*, 68 T.C.M. (CCH) 655 (1994), the court thought it important that the lender was not an equity

holder in the corporation prior to the loan. That is not so in the instant case.

did not occur in the present case. Neither *Wood Preserving* nor *Schaefer* involve the payment of personal expenses at a time when the plaintiffs were performing services for the corporation, but not receiving a salary. Those cases are distinguishable to the point that they do not aid plaintiffs' cause. Moreover, in *Wood Preserving*, the court noted that under capitalization was a factor to be used in finding advances to be contributions to capital. Triangle appeared to be drastically under capitalized initially and plaintiffs fail to show if and when the situation was corrected, if ever. There is no way to distinguish the purported $124,000+ advance from any other advance, if any.

Overall, most of the standard factors considered by other courts in similar cases weigh against plaintiffs, the only factor which is in their favor is weak, and additional factors also count against them. The Court concludes that plaintiffs have not carried their burden of proving that any contributions by them to Triangle were loans or that payments of their personal expenses by Triangle during 1988 and 1989 were repayments for any loans. Therefore, plaintiffs' claims for refunds of taxes, penalties, and interest paid on these repayments fail.

**IT IS THEREFORE ORDERED** that, for the reasons stated in the body of this opinion, plaintiffs have and recover nothing on their claims and that this action be, and the same hereby is, dismissed.

### *JUDGMENT*

For the reasons set out in a Memorandum Opinion filed contemporaneously with this Judgment,

**IT IS ORDERED AND ADJUDGED** that, for the reasons stated in the body of the opinion, plaintiffs have and recover nothing on their claims and that this action be, and the same hereby is, dismissed.