# United States Tax Court

166 T.C. No. 1

AVENTIS, INC. AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 11832-20.                    Filed January 28, 2026.

————

In 2000 P, a domestic corporation; A, P's French affiliate; B, an advisor to P; and C, a third-party bank, entered into a securitization transaction that the parties to the transaction purported to be a financial asset securitization investment trust (FASIT) under I.R.C. §§ 860H through 860L. I.R.C. §§ 860H through 860L were repealed in 2004, but P's purported FASIT remained in place through 2015. FASITs that remained outstanding in accordance with their original terms on the effective date of the repeal were exempt from the repeal.

As part of the purported FASIT, A purchased all of the outstanding shares of a class of preferred stock issued by P for the sole purpose of representing a regular interest in the FASIT under I.R.C. § 860L(b)(1). P also issued a note to B to represent the ownership interest of the FASIT under I.R.C. § 860L(b)(2), and a note to C to represent another regular interest.

For each year that the purported FASIT was outstanding, B, as holder of the ownership interest in the FASIT, reported the income that P received on the FASIT assets, and, relying on I.R.C. § 860H(c)(1), deducted amounts representing the expenses of the FASIT and the dividends paid to A. After examination of P's returns for

the 2008 through 2011 taxable years, R disregarded the FASIT because the requirement that all of the interests in the FASIT be either the ownership interest or a regular interest was not met, and R allocated income generated by the FASIT assets in each year to P.

*Held*: The preferred stock was not a valid regular interest when the purported FASIT was implemented because it did not unconditionally entitle A to a specified principal amount.

*Held, further*, the preferred stock was not a valid regular interest when the purported FASIT was implemented because it did not entitle A to interest payments based on a fixed or permitted variable rate.

*Held, further*, regardless of whether the preferred stock was a valid regular interest at the time the FASIT was implemented, it would have ceased to be a valid regular interest in the latter half of 2000 and/or in 2003 because the dividends paid to A ceased to be based on a fixed or permitted variable rate at those times.

*Held, further*, P failed to meet the requirements of the grandfather clause that was enacted when I.R.C. §§ 860H through 860L were repealed in 2004.

*Held, further*, P's failure to strictly comply with statutory requirements cannot be excused by the substantial compliance doctrine because they were essential statutory requirements rather than procedural or directory regulatory requirements.

*Held, further*, P has failed to show that it was not the beneficial owner of the assets.

*Held, further*, P must recognize the interest income generated by the FASIT assets.

*Held, further*, the preferred stock was in substance equity, and therefore P is not entitled to business interest deductions in the amounts it paid to A as dividends for each year in issue.

_____

*Rajiv Madan*, *Nathan Wacker*, *Melinda Gammello*, *Erin E. Girbach*, *Olumayowa S.O. Olujohungbe*, and *Kevin Stults*, for petitioner.

*Charles Buxbaum*, *Matthew Crouch*, *Andrew Michael Tiktin*, *Travis Vance*, and *Gretchen A. Kindel*, for respondent.

KERRIGAN, *Judge*: Respondent determined the following deficiencies in petitioner's federal income tax for its 2008−11 tax years (years in issue).

| Tax Year | Deficiency |
|----------|------------|
| 2008 | $10,469,002 |
| 2009 | 9,331,096 |
| 2010 | 9,338,611 |
| 2011 | 9,330,260 |

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for consideration are (1) whether the arrangement among petitioner, Sanofi-Aventis Amerique du Nord S.A. (SAAN), Dynamo Investments, Inc. (Dynamo), and Chase Manhattan Bank (Chase) qualified as a valid financial asset securitization investment trust (FASIT) under sections 860H to 860L (FASIT rules), (2) if the arrangement was not a FASIT, whether petitioner substantially complied with the requirements of the FASIT rules, (3) if the arrangement was not a FASIT, whether petitioner should be treated as the beneficial owner of the purported FASIT's assets, and (4) if the

arrangement was not a FASIT, whether the interest in the arrangement held by SAAN was debt or equity.[1]

## FINDINGS OF FACT

Petitioner is and was during the years in issue a Pennsylvania corporation and an indirect subsidiary of its French parent company, Sanofi, S.A. (Sanofi).[2] Sanofi and its subsidiaries are a multinational enterprise that specializes in the discovery, development, manufacture, and commercialization of prescription drugs. Petitioner is and was during the years in issue the common U.S. parent of an affiliated group of corporations that carry out Sanofi's North American operations. Petitioner filed consolidated federal income tax returns for each year in issue. Petitioner's principal place of business was New Jersey when it filed its Petition.

SAAN and Rhône-Poulenc Investissement, S.A. (RPI), were French affiliates of petitioner and were also indirect subsidiaries of Sanofi. On June 20, 2001, the shareholders of RPI approved a name change to Aventis Investissement S.A. (AI). SAAN was AI's parent company, and it dissolved AI without liquidation in 2006.[3]

From 2000 to 2011, relevant subsidiaries of petitioner include the Rorer Group Financial Co., Aventis Pharmaceuticals, Inc. (API), and Aventis Holdings, Inc. (AHI). Rhône-Poulenc Rorer International Holdings, Inc. (RPRIH) was a Delaware corporation and an indirect subsidiary of Sanofi. On December 31, 2001, RPRIH merged into Rhône-Poulenc Rorer, Inc. (RPR). Before June 20, 2002, petitioner was known as RPR.

I.    *Background of the Transaction*

Sanofi sought to expand its North American operations in the late 1990s and 2000s and needed liquid financing to accomplish this goal. Often, petitioner borrowed from its French parent Sanofi in the form of intercompany loans. As a result of growth in the United States, petitioner considered funding options, including a FASIT.

---

[1] Other adjustments in the Notice of Deficiency are computational.

[2] Before August 20, 2004, Sanofi was known as Rhône-Poulenc, Inc. Between August 20, 2004, and May 6, 2011, Sanofi was known as Sanofi-Aventis, S.A.

[3] Going forward we will refer to RPI and AI as SAAN.

In April 1999 Babcock & Brown, Inc. (Babcock & Brown),[4] an investment banking firm, presented petitioner with a proposal to use a FASIT to securitize certain intercompany loans. The creation of a FASIT would allow petitioner to meet its financing needs and obtain tax benefits on account of differing tax treatment between the United States and foreign jurisdictions.

FASITs were a statutorily created type of securitization. A securitization is a financial arrangement where a set of income- or cashflow-generating assets is pooled and repackaged into securities, denominated the ownership interest and regular interests, that are sold to different investors. Under the FASIT rules, valid regular interests of a FASIT were treated as debt.[5]

Babcock & Brown's original FASIT plan dated April 1999 proposed the use of a security labeled "preferred stock" to be sold to petitioner's French affiliate as a regular interest in a FASIT under the FASIT rules. Babcock & Brown claimed that dividends received on such preferred stock would be eligible for a "participation exemption" in European countries, including France and Germany, as well as deductible to the payor as interest payments on debt under the FASIT rules. Petitioner paid Babcock & Brown an upfront fee of $970,000 to implement the FASIT arrangement.

In December 1999 petitioner and BBH Capital, Inc. (BBH), an affiliate of Babcock & Brown, executed an Asset Management Agreement (1999 AMA) to govern the proposed FASIT. The terms of the 1999 AMA were never implemented, and the parties finalized the structure of the transaction at issue in the following year.

---

[4] Babcock & Brown converted from a corporation to a California limited partnership at some point between the 1999 FASIT proposal and June 12, 2000.

[5] Pursuant to section 860H(c)(1), a valid regular interest of a FASIT is generally treated as debt regardless of its form. *See infra* Opinion Part I.A.

II.    *The 2000 FASIT Arrangement*

A.    *FASIT Election and Initial Assets*

On July 21, 2000, the FASIT[6] was created when RPR,[7] SAAN, BBH, Chase, and Dynamo, a wholly owned subsidiary of Babcock & Brown that was created for the purpose of this transaction, entered into an Amended and Restated Asset Management Agreement (2000 AMA). The parties to the FASIT arrangement also entered into an Amended and Restated Note Purchase Agreement to govern the FASIT. In the 2000 AMA, BBH assigned its rights and obligations under the 1999 AMA to Dynamo and Chase and was effectively no longer a party to the FASIT.

Around this time a presentation was created on petitioner's letterhead explaining the arrangement. This document was entitled Approval of FASIT Transaction. The document provided background information on FASITs including their tax treatment. It specifically stated: "In computing net taxable income or loss of the FASIT, payments on these so-called regular interests are deductible regardless of the actual form of such regular interests."

This document used the term "preferred dividends" for the interest which became the Series A/E Stock. Additionally, the document explained that petitioner would treat the payment of preferred dividends as tax-deductible interest, and SAAN under French tax laws would treat the receipt of preferred dividends as nontaxable dividends. The approval presentation indicated that there would be savings of $12 million annually.

The 2000 AMA was only to be modified "by a written instrument evidencing such amendment and signed by each of the parties hereto." If the FASIT arrangement was valid, both SAAN and Chase would hold regular interests in the FASIT. Dynamo claimed it was the owner of the FASIT assets for U.S. federal income tax purposes, even though petitioner managed the FASIT assets and held legal title.

---

[6] We acknowledge that the Commissioner contends that the transaction did not qualify as a FASIT; and our use of the term to describe the transaction for the purpose of this Opinion is for clarity and does not have legal effect.

[7] Going forward we will refer to RPR as petitioner.

Petitioner designated a segregated pool of $571 million in intercompany loans on its books as the initial FASIT assets. These initial assets consisted of two debt instruments (short-term and long-term) that RPR (UK) Holdings, Ltd. (RPRUK), a subsidiary of Sanofi, issued together with certain associated currency and interest rate swaps to petitioner.

The short-term portion had a principal of £96 million and accrued interest at a variable rate equal to the current one-month London Interbank Offered Rate (LIBOR) plus 25 basis points (Initial Short-Term Loan). The Initial Short-Term Loan was repayable upon petitioner's demand, but no earlier than one year after the loan was executed.

The initial long-term portion had a principal of £545 million and accrued interest at a fixed rate of 6.85% (Initial Long-Term Loan). In 1998, £260 million of the Initial Long-Term Loan's principal was capitalized and its principal was £285 million as of 2000. The Initial Long-Term Loan matured on July 1, 2003.

The 2000 AMA limited the type of assets that the asset manager could choose as FASIT assets and referred to these assets as permitted assets. The 2000 AMA defined "permitted asset" as:

> a financial instrument[], . . . which in each case:
>    (i)     is denominated in United States dollars;
>    (ii)    has a fair market value (FMV) when acquired that is equal to the face amount thereof and otherwise does not include any "market discount" within the meaning of [s]ection 1278(a)(2), "original issue discount" within the meaning of [s]ection 1273(a)(1), or "bond premium" within the meaning of [s]ection 171(b);
>    (iii)   is (a) treated as a "variable rate debt instrument" and bears interest at a qualified floating rate within the meaning of Treasury Regulation section 1.1275-5(b) (including a synthetic debt instrument within the meaning of Treasury Regulation section 1.1275-6), (b) a fixed rate bank deposit, (c) shares in a money market fund within the meaning of Rule 2a-7 under the Investment

Company Act of 1940, as amended, or (d) a fixed rate debt instrument;

(iv)  has a yield to maturity when acquired that is less than the Applicable Federal Rate in effect for the calendar month in which the asset is acquired by the Company plus 5 percentage points;

(v)  matures as to principal and interest, or is redeemable at the option of the holder thereof at a redemption price equal to the principal amount thereof plus accrued interest thereon, on or prior to the last Business Day of the Initial Term or the then current Renewal Term [of the FASIT], as applicable; and

(vi)  is not issued by [Dynamo or Chase] or any Affiliate of [Dynamo or Chase] . . . .

Both the short-term and long-term initial assets were permitted assets pursuant to the 2000 AMA and met the statutory definition of permitted assets in section 860L(c)(1).

Petitioner issued three FASIT interests to the FASIT investors, the returns on which were funded by the interest income generated by the FASIT assets. The three FASIT interests were:

Class I Note issued to Dynamo in exchange for $500,000, designated the ownership interest;[8]

Class II Note issued to Chase Bank in exchange for $11.5 million, designated a regular interest in the FASIT;[9] and

Series A/E Stock[10] issued to SAAN in exchange for $559,500,000, designated a regular interest in the FASIT.[11]

---

[8] The designation as an ownership interest does not mean that the statutory requirements have been met.

[9] The designation as a regular interest does not mean that the statutory requirements have been met.

[10] Our use of the term "stock" for the purpose of this Opinion is for clarity and does not have legal effect.

[11] The designation as a regular interest does not mean that the statutory requirements have been met.

When RPRIH merged into petitioner in 2001, petitioner had an unrelated class of outstanding preferred stock it identified as "Series A" preferred stock. To distinguish the FASIT-issued Series A Stock in RPRIH from petitioner's preexisting Series A shares, each share of the FASIT-issued Series A Stock in RPRIH was converted into a share of "Series E" stock of petitioner in the merger. For each year in issue, the stock remained outstanding as Series E Stock in petitioner. We refer to the 280 shares in petitioner that were issued as part of the transaction as "Series A/E Stock."



Dynamo filed a FASIT election with its Form 1120, U.S. Corporation Income Tax Return, for its taxable year ending March 31, 2001, to treat the FASIT arrangement as a FASIT for U.S. federal income tax purposes, on July 21, 2000. Dynamo was an eligible corporation as defined in section 860L(a)(2). The FASIT election identified each of the Initial Loans and a money market account as the initial FASIT assets. The initial FASIT assets had an aggregate principal amount of $571,500,000. Petitioner did not have any collateral securing either of the Initial Loans.

B.    *Securities Issued to Interest Holders*

The income generated by the FASIT assets was distributed annually to the Class I Noteholder, the Class II Noteholder, and the Series A/E Stockholder on December 31 of each year. First, the income from the FASIT was used to pay the asset manager's fee. Second, the income was used to pay the interest due to the Class I and Class II Noteholders on their respective returns. Third, the remaining income was eligible to be distributed as dividends to the Series A/E Stockholder.

The Class I Noteholder and the Class II Noteholder were both entitled to receive FASIT Rate Interest and Supplemental Interest each year. FASIT Rate Interest and Supplemental Interest were calculated daily. FASIT Rate Interest was calculated as the principal amount of the Class I or Class II Note multiplied by the "FASIT Rate." The FASIT Rate for each day was defined as the amount of interest accrued on that day by the underlying FASIT assets, less the asset manager's fee, and any guaranty fee, divided by the principal amount of the FASIT assets. Supplemental Interest entitled the Class I and II Noteholders to yearly interest at a rate of 1.5522% of the principal amount of the respective Note.

As included in the 2000 AMA and in the Class I Note, Dynamo as the Class I Noteholder was entitled to Additional Interest, which was an amount equal to the excess, if any, of (1) the total amount of income (other than gain) earned on the FASIT assets during such Accrual Period, less (2) the sum of (i) the amount of FASIT Rate Interest and Supplemental Interest due under this Note in respect of such Accrual Period, (ii) the amount of FASIT Rate Interest and Supplemental Interest (as defined in the Class II Note of the Company) due under the Class II Note of the Company in respect of such Accrual period, and (iii) the sum of the amounts for each day during such Accrual Period equal to (a) the FASIT Rate for each such day minus 0.00033291153 divided by (y) 365 or 366 as appropriate multiplied by (b) the Adjusted Issue Price of the Series A/E Stock.

Under the 2000 AMA any gain realized from a FASIT asset during an accrual period would be allocated to the Class I Note. All determinations of income, gain, loss, or deduction under the transaction documents were to be made under U.S. federal income tax principles except where otherwise indicated.

The Additional Interest formula was structured to reflect the FASIT Rate Interest and Supplemental Interest paid to the Class I Noteholder and the Class II Noteholder on the principal amount of $12 million. The Additional Interest formula was designed to compute to zero, meaning after distribution of the FASIT Rate Interest and Supplemental Interest, no residual income should have remained from the FASIT assets to be allocated as Additional Interest. From 2000 through 2011 petitioner calculated the Additional Interest due to Dynamo to be zero.

The terms of the Series A/E Stock were set forth in a Certificate of Voting Powers, Designations, Preferences, and Restriction (Stock Certificate).  As holder of the Series A/E Stock, SAAN was entitled to one vote per share on all corporate matters and voted with the holders of petitioner's common stock.  SAAN was also entitled to elect one director of petitioner's board of directors.  Petitioner labeled the Series A/E Stock as preferred stock with signatures from two of its officers.  Additionally, petitioner treated the Series A/E Stock as preferred stock for book accounting purposes.

If the Series A/E Stock was treated as equity for French tax purposes, SAAN was entitled to a "participation exemption" for dividends on such stock and did not pay tax on the amount exempted.  Dividends were payable on the Series A/E Stock at the discretion of petitioner's board of directors.  The undistributed profits available for payment on the Series A/E Stock were the earnings on the FASIT assets less payments of interest due to the Class I Note and the Class II Note, the asset manager's fee, any guaranty fee, and any other expense of the FASIT.  Dividends were cumulative, meaning that for each accrual period, the Series A/E Stockholder accrued the right to receive the FASIT's distributable profits for that accrual period regardless of whether the distributable profits were actually paid out as dividends.  Payments on the Series A/E Stock could not be made from petitioner's general corporate assets.

Petitioner's board of directors declared dividends on the Series A/E Stock each year from 2000 to 2011, except 2001, in the following amounts:

| Year | Dividend Amount |
|------|----------------:|
| 2000 | $16,342,405 |
| 2002 | 11,314,602 |
| 2003 | 11,997,891 |
| 2004 | 23,673,649 |
| 2005 | 27,814,151 |
| 2006 | 30,019,360 |
| 2007 | 29,999,009 |
| 2008 | 29,904,535 |
| 2009 | 29,615,679 |
| 2010 | 29,639,535 |
| 2011 | 29,613,027 |

The Stock Certificate included a provision addressing the redemption of the Series A/E Stock upon termination of the FASIT. The Series A/E Stock was to be redeemed at a price equal to the fair market value (FMV) of the FASIT assets less the amounts due on the Notes, and any other accrued and unpaid expenses of the FASIT, referred to as a "liquidation preference."

C.    *The Money Market Account*

The FASIT assets paid interest semiannually. Each year, during the interim period between the interest payment on the FASIT assets to petitioner and the yearend payment petitioner made to the FASIT investors, the interest was deposited and held in a money market account. This enabled the funds to earn interest before payment to the FASIT investors. The money market account represented a temporary investment of earnings of the FASIT arrangement pending distribution. The interest from the money market account was included in FASIT earnings. Dynamo reported the earnings from the money market account as dividend income.

From 2000 to 2011, petitioner advised that the money market account earned dividend income as follows:

| Year | Dividend Income |
|------|-----------------|
| 2000 | $206,981 |
| 2001 | 474,087 |
| 2002 | 94,804 |
| 2003 | 43,022 |
| 2004 | 98,070 |
| 2005 | 260,392 |
| 2006 | 395,921 |
| 2007 | 398,806 |
| 2008 | 223,200 |
| 2009 | 15,408 |
| 2010 | 39,268 |
| 2011 | 12,756 |

D.    *Asset Manager*

Pursuant to the 2000 AMA and the 2003 AMA,[12] RPRIH and then petitioner were appointed the asset manager of the FASIT assets. The asset manager received annual compensation equal to 0.005% of the FASIT amount, computed daily. The FASIT amount was defined as the aggregate principal amount of the Class I and II Notes and the aggregate adjusted issue price of the Series A/E Stock as of any date. In its capacity as asset manager, petitioner was able to guarantee the FASIT assets in exchange for an additional fee "to be determined by [petitioner] in accordance with customary commercial practices." No guaranty fees were paid in conjunction with the FASIT arrangement.

There was no separate FASIT entity. At all times the FASIT existed as a segregated pool of assets on petitioner's balance sheet.

---

[12] The AMA was updated in 2003 and is addressed *infra* Findings of Fact Part III.

Petitioner was subject to various restrictions with regard to the FASIT assets.

Petitioner, as asset manager of the FASIT arrangement, was required under the AMA to hold the FASIT assets until maturity or redemption. Additionally, petitioner was authorized to replace any FASIT asset with any other permitted asset of equal principal amount so long as the replacement did not result in the realization of gain or loss to any person for U.S. federal income tax purposes, and provided that the aggregate principal amount of the FASIT assets was at all times equal to the FASIT amount. The 2000 AMA prohibited petitioner from (1) pledging, granting a security interest, assigning as a security, or otherwise encumbering the FASIT assets; (2) issuing any additional debt securities on parity with or senior to the Class I and II Notes; or (3) applying any income received from the FASIT assets in a manner other than as specified in the 2000 AMA.

Section 5 of the 2000 AMA specified how petitioner was to apply income generated from the FASIT assets. At the end of each year, petitioner was required to apply FASIT earnings in the following order: (1) to payment of the asset manager's fee, (2) to payment of any guaranty fee and any other expenses of the FASIT, (3) to payments made on the Class I Note and the Class II Note, and (4) to the extent petitioner's board of directors declared dividends, to payment on the Series A/E Stock.

In accordance with the AMA, petitioner was required to invest FASIT earnings not distributed at yearend into additional permitted assets which would then be considered FASIT assets. Any gain realized in respect of FASIT assets was to be allocated to the Class I Note and any loss in respect of FASIT assets was to be allocated to the Series A/E Stock. No valuation study was ever done to determine the FMV of the FASIT assets.

III.    *2003 and 2005 Changes to the FASIT*

On September 30, 2003, petitioner acknowledged receipt of £289,867,553 from RPRUK as payment in full satisfaction of the Initial Long-Term Loan. With part of the proceeds, petitioner acquired a new FASIT asset—a promissory note reflecting a loan from AHI to API, each a subsidiary of petitioner, with a principal amount of $415,600,000 that accrued interest at a fixed rate of 5.02% per year (2003 Loan). The 2003 Loan matured on December 29, 2012. The 2003 Loan was secured by

certain of API's receivables pursuant to a security agreement. The covered amount in the security agreement equaled 110% of the principal amount of the 2003 loan. The 2003 Loan met both the 2000 AMA requirements and the statutory requirements for a permitted asset.

With the remaining funds petitioner repaid $400,000 of the $500,000 principal outstanding on the Class I Note and redeemed the Class II Note in full. At the outset of the FASIT arrangement, Chase lent Dynamo $400,000 of the $500,000 purchase price of the Class I Note. Dynamo used the proceeds from the partial redemption of the Class I Note to satisfy its obligation to Chase. Upon redemption of the Class II Note, Chase withdrew from the FASIT entirely.

To reflect Chase's withdrawal and the accompanying changes to the FASIT assets, a Second Amended and Restated Asset Management Agreement (2003 AMA) and a Second Amended and Restated Note Purchase Agreement were executed on September 30, 2003. The 2000 and 2003 AMAs were generally the same, except for the absence of Chase. The terms of the Series A/E Stock were not amended and none of the stock was redeemed as a result of the 2003 changes to the FASIT.

From 2000 through September 30, 2003, when Chase withdrew from the FASIT arrangement, the Class I Noteholder never received Additional Interest. After Chase's withdrawal, the Class I Note was revised to reflect the reduction in principal from $500,000 to $100,000. The Class I Note's Additional Interest provision was not updated to reflect the reduction of third-party investment to $100,000.

Before and after the 2003 AMA was in effect, Dynamo was entitled to Additional Interest equal to FASIT income less the sum of (1) FASIT Rate Interest due on the Note(s), (2) Supplemental Interest due on the Note(s), and (3) the FASIT Rate minus 0.00033291153 multiplied by the adjusted issue price of the Series A/E Stock. After the changes to the FASIT assets in 2003, petitioner continued to calculate the Additional Interest due to Dynamo as zero.

On July 1, 2005, the remaining initial asset, RPRUK's Short-Term Loan of £102,914,946 ($144 million), was repaid. Petitioner used the proceeds from the repayment of the Initial Short-Term Loan to purchase an additional account receivable from AHI to API in the amount of $144 million (2005 Loan) that matured on March 31, 2015. Consequently, as of July 1, 2005, the FASIT held two intercompany receivables due from API. The 2005 Loan accrued interest annually at

a fixed rate of 5.81%. The 2005 Loan met the definition of a permitted asset as defined in the 2000 AMA and the statutory requirements of a permitted asset. By a separate security agreement, API's receivables similarly secured up to 110% of the principal amount of the 2005 Loan.

IV.    *2005 Renewal and Subsequent Renewals of the FASIT*

Under the terms of the 2000 and 2003 AMAs, the FASIT was set to terminate on January 15, 2005, unless the parties to the FASIT arrangement mutually agreed to extend the arrangement for another five-year term. The FASIT arrangement could be extended in five-year increments with the total term not to exceed 30 years. Each party was required to notify the other parties in writing of its intention to extend the FASIT by October 15 of the year before the end of each term. By letter agreement dated January 14, 2005, the parties mutually agreed to extend the FASIT for a second five-year term ending January 15, 2010. None of the parties provided renewal notice in accordance with the 2003 AMA by October 15 of the year before termination (2004). Instead the parties agreed to waive the 90-day notice requirement in the letter agreement dated January 14, 2005.

Leading up to the 2010 renewal of the FASIT, Babcock & Brown became insolvent. To ensure Dynamo's financial wellbeing through a third five-year term, petitioner sought to have Dynamo sold to a third party.

On January 15, 2010—the same day petitioner, SAAN, and Dynamo agreed to renew the FASIT for its third five-year term— petitioner's affiliate Sanofi-Aventis, U.S., Inc., entered into an agreement with Babcock & Brown (put option agreement). The put option agreement granted Babcock & Brown an option to sell all of the Dynamo shares to Sanofi-Aventis, U.S., Inc. subject to certain conditions. The put option agreement granted Sanofi-Aventis, U.S., Inc. and API the right to designate any other entity described by petitioner's officers as a "friendly" partner, as purchaser of the Dynamo shares under the agreement. Petitioner paid Babcock & Brown $2,275,000 in exchange for renewing the FASIT and the rights granted in the put option agreement. Around July 2010 Chase acquired Dynamo.

V.    *Termination of the FASIT*

The parties to the FASIT arrangement did not extend it in 2015 for a fourth five-year term. Instead of extension, the parties adopted a plan of liquidation to unwind the FASIT effective January 15, 2015. The

FASIT arrangement terminated in April 2015. Under the plan of liquidation, petitioner was required, within 90 days, to liquidate the FASIT assets, pay the expenses of the FASIT, and use the remaining proceeds to redeem the Class I Note and the Series A/E Stock. The redemption price of the Series A/E Stock was equal to the aggregate "liquidation preference" as of such date.

VI.     *Tax Reporting and Determination of Deficiency*

Under the 2000 and 2003 AMAs, petitioner was required to treat Dynamo as the owner of the FASIT assets for U.S. tax purposes. Accordingly, Dynamo included on its federal income tax returns the income received on the FASIT assets and deducted payments made on the Class II Note while it was outstanding, dividends paid on the Series A/E Stock, and the asset manager's fee. For years 2008 through 2010 Dynamo reported earnings from the money market account as dividend income on its tax returns. For years 2010 through 2012, after Chase acquired Dynamo, Chase reported Dynamo's interest income on the Class I Note and the FASIT's income and expenses as part of its consolidated group.

Petitioner filed consolidated Forms 1120 for each year in issue. Petitioner reported the Series A/E Stock as "preferred stock" on its Schedule L, Balance Sheets per Books, for each year in issue. On the Schedules M–2, Analysis of Unappropriated Retained Earnings per Books, attached to its Forms 1120 for each year in issue, petitioner reported various amounts of "Other decreases." Part of the "Other decreases" for each year was a "FASIT Asset Retained Earnings Adjustment" in the following amounts: $29,901,427, $29,617,411, $29,637,801, and $29,614,577 for 2008, 2009, 2010, and 2011, respectively. These numbers reflect amounts received as interest on FASIT assets and as payments due on the Class I Note and dividends declared on the Series A/E Stock.

After examination respondent disregarded Dynamo's FASIT election and designation as owner of the FASIT assets for tax purposes. Respondent allocated the income generated by the FASIT assets less the interest paid to Dynamo, asset manager's fees, and FASIT expenses to petitioner.

VII.    *Summary of Expert Witnesses*

Various witnesses gave testimony relevant to the FASIT arrangement and to the substantive terms of the Series A/E Stock.

Among those witnesses were the following experts, whose reports will be discussed further throughout this Opinion.

A.     *Petitioner's Expert, Michael Cragg*

Petitioner offered expert testimony from Michael Cragg, a senior partner at a global economic consulting firm with a Ph.D. in economics. Dr. Cragg has over 25 years of experience analyzing financial markets and the public financial services sector for the purposes of research, advising, and testifying. Dr. Cragg concluded that the Series A/E Stock was more similar to debt than to equity and that the FASIT arrangement did not cause an economic loss to the U.S. Treasury.

B.     *Respondent's Experts*

1.     *Evan Cohen*

Respondent offered expert testimony from Evan Cohen, the principal and chairman of an economic consulting firm based in Boston, Massachusetts. Mr. Cohen has a master's degree in business administration with a concentration in financial engineering. He received his Chartered Financial Analyst designation from the Chartered Financial Analyst Institute in 2013. Mr. Cohen has over 25 years of experience in capital structure, corporate finance, and economics.

Mr. Cohen's opinion concluded from a financial and economic perspective that petitioner did not make an economic commitment to return a predictable, pre-specified amount of capital to the Series A/E Stockholder. He also concluded that petitioner did not make an economic commitment to make predictable, pre-specified dividend payments to the Series A/E Stockholder and that petitioner's commitment to make dividend payments was not consistent with debt instruments. Additionally, he concluded that there was not sufficient information for the Series A/E Stockholder to assess the risk of the Series A/E Stock while the instrument was outstanding.

2.     *Nasser Ahmad*

Respondent offered expert testimony from Nasser Ahmad, the managing partner and chief investment officer of an asset management firm based in New York, NY. Mr. Ahmad has a master's degree in electrical engineering and computer science and has acquired over 30 years of experience in the financial services industry since completing

his education. In particular, Mr. Ahmad has extensive experience analyzing and trading fixed income securities, structured and securitized debt, and public and private equity.

Mr. Ahmad concluded that the Series A/E Stock was structured as equity, with characteristics that align with typical equity features. Additionally, he concluded that market participants acting in an arm's-length manner would have recognized and treated the Series A/E Stock as equity. His testimony also addressed the allocation of cashflows pertaining to the money market account following Chase's withdrawal from the arrangement and whether this allocation would be expected in an arm's-length transaction.

OPINION

We must first decide whether the FASIT arrangement was a valid FASIT pursuant to the statutory requirements. If the FASIT was not valid, we consider the following: (1) whether there was substantial compliance, (2) whether petitioner was the beneficial owner of the FASIT assets, and (3) whether the Series A/E Stock should be treated as debt for federal income tax purposes. Petitioner contends that the FASIT arrangement was valid for the years in issue. In contrast respondent contends that the FASIT arrangement was invalid from its inception in 2000.

Respondent determined that petitioner was required to recognize interest income on the assets identified in the FASIT arrangement for the years in issue. Generally, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioner does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

Respondent in support of his argument that the FASIT arrangement was not a valid arrangement offered Exhibit 314-R, Revenue Agent Lynch's notes from her interview with Clifford Losh held on October 24, 2013. At trial Exhibit 314-R was admitted as a business record. Ruling on whether the notes can be admitted as nonhearsay was reserved. Both Ms. Lynch and Mr. Losh testified during the trial. The issue of whether the document is an exception to hearsay does not need to be decided as the notes are not relevant. Accordingly, Exhibit 314-R is not admitted for any additional purpose. *See* Fed. R. Evid. 403.

I.      *Overview of FASITs*

Statutorily created FASITs were a type of securitization, which is the process of pooling assets into a fund or entity and selling securities backed by the specified pool of assets.  Generally, income generated by the securitized assets funded interest and principal payments made to the holders of the securities.

A.      *The FASIT Rules*

The FASIT rules were enacted pursuant to section 1621(a) of the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755, 1858.  The purpose of the statutorily created FASIT was to permit the securitization of pools of nonmortgage debt obligations held by financial institutions in order to

> spread the risk of credit on the debt to others.  The [Senate Finance] Committee believe[d] that the spreading of credit risk will lessen the concentration of such risk in banks and other financial intermediaries which, in turn, will lessen the pressure on Federal deposit insurance.  Further, the Committee believe[d] that the spreading of credit risk through securitization will result in lower interest rates for consumers.

S. Rep. No. 104-281, at 126 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1474, 1600.

The FASIT rules of section 860L(a)(1) set forth five statutory requirements for FASIT qualification:

> (1) In general.—For purposes of this title, the terms "financial asset securitization investment trust" and "FASIT" mean any entity—
>> (A) for which an election to be treated as a FASIT applies for the taxable year,
>> (B) all of the interests in which are regular interests or the ownership interest,
>> (C) which has only one ownership interest and such ownership interest is held directly by an eligible corporation,
>> (D) as of the close of the third month beginning after the day of its formation and at all times thereafter, substantially all of the assets of

which (including assets treated as held by the entity under section 860I(b)(2)) consist of permitted assets, and

    (E) which is not [a regulated investment company] described in section 851(a).

Subject to exceptions not relevant here, domestic subchapter C corporations were "eligible corporations" that could hold the ownership interest of a FASIT. § 860L(a)(2). Section 860L(c)(1) defines permitted assets as:

> (1) In general.—The term 'permitted asset' means—
>     (A) cash or cash equivalents,
>     (B) any debt instrument (as defined in section 1275(a)(1)) under which interest payments (or other similar amounts), if any, at or before maturity meet the requirements applicable under clause (i) or (ii) of section 860G(a)(1)(B),
>     (C) foreclosure property,
>     (D) any asset—
>         (i) which is an interest rate or foreign currency notional principal contract, letter of credit, insurance, guarantee against payment defaults, or other similar instrument permitted by the Secretary, and
>         (ii) which is reasonably required to guarantee or hedge against the FASIT's risks associated with being the obligor on interests issued by the FASIT,
>     (E) contract rights to acquire debt instruments described in subparagraph (B) or assets described in subparagraph (D),
>     (F) any regular interest in another FASIT, and
>     (G) any regular interest in a REMIC.

When considered together, the FASIT rules' requirements demonstrate that FASITs were a method of securitization intended to pass the economic exposure to underlying debt instruments through the FASIT entity to investors. In accordance with this objective, a valid regular interest in a FASIT is treated as debt for federal income tax purposes regardless of how it would be classified by other standards of law. § 860H(c)(1).

B.     *Repeal of the FASIT Rules*

The FASIT rules were repealed by section 835(a) of the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, 118 Stat. 1418, 1593.  The House Committee on Ways and Means stated that "FASITs are not being used widely in the manner envisioned by the Congress" as a reason for the repeal.  H.R. Rep. No. 108-548, pt. 1, at 291 (2004).  Specifically, the Committee noted that FASITs are "particularly prone to abuse and are likely being used primarily to facilitate tax avoidance transactions" and further stated that the Committee was aware that FASITs were being used "to facilitate the issuance of certain tax-advantaged cross-border hybrid instruments that are treated as indebtedness in the United States but equity in the foreign country of the holder of the instruments" and that was not the intention when Congress enacted the FASIT rules.  *Id*. at 291 & n.325.

The repeal of the FASIT rules was effective January 1, 2005, except for those FASITs "in existence on [October 22, 2004] to the extent that regular interests issued by the FASIT before such date continue to remain outstanding in accordance with the original terms of issuance." AJCA § 835(c) (grandfather provision), 118 Stat. at 1594.  For the FASIT arrangement to be valid for the years in issue, the arrangement must be valid, at all times, from its inception and at all times before 2008, which includes meeting the requirements of the grandfather provision.

II.     *Analysis of FASIT Arrangement Validity*

In the Notice of Deficiency, respondent determined that the FASIT arrangement was not a valid FASIT at all times before the effective date of the grandfather provision, for two reasons.  First, respondent argues that the Series A/E Stock did not meet the requirements of a valid regular interest of a FASIT at three specific times: (1) from inception, (2) in the latter half of 2000 because of the allocation of income earned by the money market account, and (3) in the latter half of 2003 because of Chase's withdrawal from the arrangement. Second, respondent argues that when the parties altered the terms of the FASIT when they renewed the FASIT by letter agreement on January 14, 2005, the extension had no effect because the FASIT had terminated on its own.

A. *The Series A/E Stock Was Not a Valid Regular Interest from the Arrangement's Inception.*

A valid FASIT must meet five statutory requirements. *See* § 860L(a)(1). The FASIT arrangement at issue failed to meet the requirement that all interests were regular interests or the ownership interest.

1. *Requirements of a Regular Interest in a FASIT*

A regular interest in a FASIT was any interest issued by the FASIT on or after the startup date that was designated a regular interest, had fixed terms, and satisfied the following five requirements:

> (i) such interest unconditionally entitles the holder to receive a specified principal amount (or other similar amount),
> (ii) interest payments (or other similar amounts), if any, with respect to such interest are determined based on a fixed rate, or, except as otherwise provided by the Secretary, at a variable rate permitted under section 860G(a)(1)(B)(i),
> (iii) such interest does not have a stated maturity (including options to renew) greater than 30 years (or such longer period as may be permitted by regulations),
> (iv) the issue price of such interest does not exceed 125 percent of its stated principal amount, and
> (v) the yield to maturity on such interest is less than the sum determined under section 163(i)(1)(B) with respect to such interest.

§ 860L(b)(1)(A).

With respect to the Series A/E Stock's classification as a regular interest, respondent challenges its satisfaction of the first two requirements: (i) such interest unconditionally entitles the holder to receive a specified principal amount (or other similar amount), and (ii) interest payments (or other similar amounts), if any, with respect to the

stock were based on a fixed rate, or, except as otherwise provided by the Secretary, at a variable rate permitted under section 860G(a)(1)(B)(i).[13]

> 2. *Lack of an Unconditional Return of a Prespecified Principal Amount on Series A/E Stock*

The Series A/E Stock had no principal amount, and its terms were described by the Stock Certificate instead of a note purchase agreement or a promissory note. The Stock Certificate provided that the Series A/E Stock's original issue price was $1,998,214 per share. To satisfy the requirement that a regular interest unconditionally return a pre-specified principal amount under section 860L(b)(1)(A)(i), the Series A/E Stock should have unconditionally entitled SAAN to receive $1,998,214 per share or a specified amount upon redemption or liquidation of the FASIT.

Respondent argues that the liquidation preference did not entitle the Series A/E Stockholder to any specified amount and therefore did not satisfy the return of principal requirement. Petitioner argues the liquidation preference was structured in a manner that entitled the Series A/E Stockholder to receive the original issue price of $1,998,214, or $559,500,000 in total, upon liquidation or redemption of the stock under any circumstance. We agree with respondent.

The Series A/E Stock entitled its holder to receive upon liquidation or redemption of the stock an amount limited to the liquidation preference. The Series A/E Stock's liquidation preference was contingent on both the FMV of the FASIT assets at the time of liquidation and the fees and expenses incurred in managing the FASIT assets. Respondent's expert Mr. Ahmad explained that the liquidation preference effectively subordinated the payments due to the Series A/E Stockholder upon liquidation to those payments due to the Class I and II Noteholders. According to his report the Series A/E Stockholder was the "last in line" to get paid because there was no other investor in this securitization that was subordinate to the Series A/E Stockholder. The Series A/E Stockholder would receive the balance after all other claims are made.

---

[13] Section 860G and the accompanying regulations provide rules applicable to Real Estate Mortgage Investment Conduits (REMICs), another type of securitization of debt obligations. As is the case here, the FASIT rules incorporated by reference many rules applicable to REMICs.

The FASIT arrangement did not provide the Series A/E Stock with a specified principal or similar amount because the liquidation preference was tied to the FMV of the FASIT assets. The FMV of an asset is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551 (1973). The liquidation preference directly correlated with the FMV of the FASIT assets because the Series A/E Stock was entitled only to payment from the FASIT assets and not petitioner's general assets.

Respondent relied upon the expert testimony of Mr. Cohen to explain why the FMV of the FASIT assets could vary over time, meaning the liquidation preference could vary. Fixed rate debt instruments can vary over their life, as the fixed rate of return becomes more or less favorable relative to other available instruments. This results in the FMV of fixed rate assets varying with changes in market rates.

Mr. Cohen further explained that petitioner did not take steps to protect the Series A/E Stockholder from FMV variation. To be consistent with the AMAs petitioner should have managed the FASIT assets to ensure that they would mature at the time of redemption. Petitioner included assets in the FASIT pool that were not set to expire at the end of the current term of the FASIT.

Mr. Cohen also explained that the Series A/E Stockholder bore the risk of FMV variations caused by the issuer's change in credit risk. If the financial condition of a borrower declines, the risk of default increases and the FMV of the debt also declines. The inverse is also true and the FMV of the debt increases if the financial condition of the borrower improves.

According to Mr. Cohen, if FASIT assets were liquidated before the end of the AMA or if they were not scheduled to mature before the end of the current five-year term, the FMV of the FASIT assets would vary with changes in the underlying issuer's credit quality. The Series A/E Stockolder bore this risk that more or less than the full capital contribution of the Series A/E Stock could be returned.

Security agreements mitigated the credit risk the FASIT was exposed to with respect to the 2003 and 2005 Loans. Rather than repayment of the loans depending on API's creditworthiness, the security agreements merely shifted the FASIT's risk to that of the ability

of API's creditors to fulfill the receivables. Therefore, the FASIT was at all times subject to some level of credit risk that could have negatively affected the FMV of the FASIT assets.

Further, variation of the expenses of the FASIT could have negatively affected the value of the liquidation preference. One potential expense was petitioner's option to guarantee the value of the FASIT assets. The AMAs gave petitioner discretion to, at any time, provide a guaranty on the value of the FASIT assets in exchange for a periodic guaranty fee at a rate "to be determined by [petitioner] in accordance with customary commercial practices." Even though petitioner never offered a guaranty on the value of the FASIT assets, its option to do so throughout the tenure of the FASIT at an unspecified rate could have negatively affected the value of the liquidation preference. This effect could have resulted in the Series A/E Stockholder's receiving less at liquidation than expected at the outset of the transaction.

If the FMV of the FASIT assets had declined below the aggregate original issue price of the Series A/E Stock at the time of calculation of the liquidation preference, petitioner was not obligated to pay the lost value to the Series A/E Stockholder. Consequently, the Series A/E Stockholder would bear any reduction in the FMV of the FASIT asset or increase in FASIT expenses. The liquidation preference therefore could not have unconditionally entitled the Series A/E Stockholder to receive the original issue price of $1,998,214 per share or a specified amount.

3.    *Whether the Series A/E Stock Entitled Its Holder to Payments Based on a Fixed Rate, or a Permitted Variable Rate, Such as a Weighted Average Rate*

The Series A/E Stock failed to comply with the FASIT rules' requirements governing periodic payments to its regular interest holders. §§ 860L(b)(1)(A)(ii), 860G(a)(1)(B)(i). Treasury Regulation § 1.860G-1(a)(3)(i) and (ii) provides that a permissible variable rate includes a rate based on a current interest rate (a qualified floating interest rate) or a weighted average rate. An interest rate is a qualified floating rate "if variations in the value of the rate can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds in the currency in which the debt instrument is denominated." Treas. Reg. § 1.1275-5(b)(1). A rate that correlates with a benchmark interest rate, such as the federal funds rate or LIBOR, is considered a qualified floating rate and thus a permitted variable rate.

The regulations clarify that certain modifications to floating interest rates are permissible; relevantly: "A rate is a variable rate if it is— . . . (B) [e]xpressed as a constant number of basis points more or less than a rate described in [Treas. Reg. § 1.860G-1(a)(3)(i) or (ii)] . . . ." Treas. Reg. § 1.860G-1(a)(3)(iii)(B).

A variable rate could be a qualified floating rate or a rate based on a weighted average of the interest rates on some or all of the assets held by the FASIT. *Id.* subpara. (3). A weighted average interest rate is generally "a rate that, if applied to the aggregate outstanding principal balance of a pool of mortgage loans for an accrual period, produces an amount of interest that equals the sum of the interest payable on the pooled loans for that accrual period." *Id.* subdiv. (ii). "[A]n interest rate is considered to be based on a weighted average rate even if, in determining that rate, the interest rate on some or all of the qualified mortgages is first subject to a cap or a floor, or is first reduced by a number of basis points or a fixed percentage." *Id.* subdiv. (ii)(B).

The maximum amount payable to the Series A/E Stockholder was the FASIT earnings less interest paid on the Class I and Class II Notes and accrued expenses. The dividend of the Series A/E Stock could vary depending on whether the FASIT decided to pay the appropriate interest, including Additional Interest due to the Noteholders.

The Stock Certificate did not include provisions that would require payments based on a weighted rate or any other rate to the Series A/E Stockholder. Instead, the Stock Certificate authorized petitioner's board of directors to declare dividends on the stock at its discretion and subject to the terms set forth in the Stock Certificate. The amounts of such dividends were not calculated using a fixed rate. Dividends were cumulative, meaning that if petitioner's board did not declare a dividend on the Series A/E Stock for a given year, the Series A/E Stockholder still became entitled to the FASIT's distributable profits for that year. The Series A/E Stockholder was not entitled to payment of any specified amounts.

Petitioner argues that the lack of a specified rate is not detrimental because the liquidation preference was structured to ensure that throughout the life of the FASIT, the Series A/E Stockholder would effectively receive interest payments determined by the FASIT Rate minus 3.3 basis points, which it argues is a weighted average rate. This argument relies on the premise that any distributable profits of the FASIT that were not distributed increased the liquidation preference of

the stock because such unpaid dividends were required to be reinvested into a FASIT asset. Petitioner contends that even with dividends on the Series A/E Stock being at the discretion of petitioner's board of directors, the Series A/E Stockholder would receive a weighted average rate over the life of the FASIT by virtue of any dividends actually paid plus the liquidation preference.

Petitioner's argument fails because both the timing and the amounts of dividends were ultimately at the discretion of petitioner's board of directors. The Series A/E Stockholder had no mechanism to enforce declaration of a dividend. Accordingly, the Series A/E Stock does not meet the requirements for a regular interest under section 860L(b)(1)(A)(ii).

4.     *Conclusion*

The Series A/E Stock did not satisfy the following two requirements of a regular interest, that it (i) entitled the holder to a specified principal amount or other similar amount upon termination and (ii) entitled the holder to payments on a fixed rate per a permitted variable rate. Accordingly, the FASIT arrangement was not a valid FASIT from its inception. *See* § 860L(a)(1)(B).

B.     *Other Instances Also Resulted in the Arrangement's Not Being a FASIT.*

As discussed above, we concluded that the arrangement was not a valid FASIT from its inception. Even if we concluded the opposite, several instances resulted in the arrangement's no longer being a FASIT. Respondent contends that the following resulted in the arrangement's not being a valid FASIT: (1) when in the latter half of 2000 the Series A/E Stockholder received interest generated from a money market account exceeding a weighted interest rate; (2) when, after Chase's withdrawal from the arrangement in 2003, petitioner paid funds to SAAN that should have been paid to Dynamo; and (3) when the parties changed the terms of the FASIT.

1.     *Effect of Money Market Income on the Series A/E Stock's Status as a Regular Interest*

Beginning in the latter half of 2000 and continuing throughout the life of the arrangement, petitioner invested income earned on the FASIT assets in a money market account. The investment in the money market account increased the FASIT income, resulting in an increase of

the principal amount of FASIT assets, increasing the Additional Interest owed to Dynamo.

Petitioner identified the money market account as a FASIT asset, and treated the income generated by it as FASIT income. Petitioner, however, did not treat the amounts deposited into the money market account as increasing the principal of the FASIT assets for the purpose of determining FASIT Rate Interest.

Petitioner contends that the money market account was a separate mechanism to keep the deposited funds generating income before they were paid out to FASIT investors and that the money market account was not intended to be considered a FASIT asset for the purpose of calculating Additional Interest. Additionally, petitioner argues that even if the funds deposited into the money market account increase the principal amount of the FASIT, its pro rata payment of the money market interest was consistent with the permitted variable rate requirement.

The 2000 and 2003 AMAs did not explicitly address how income from the money market account would be treated by the FASIT; however, they provided guidance. Under the terms of the 2000 and 2003 AMAs, the FASIT Rate was determined in order to calculate the Additional Interest. The FASIT Rate was calculated using FASIT income net of fees in the numerator and the principal amount of the FASIT assets as the denominator. As the denominator figure increases, the resulting FASIT Rate decreases. For example, if two pools of assets produce the same amount of income, the pool with the higher principal amount of underlying assets boasts a lower rate of return.

Respondent's expert Mr. Ahmad explained that petitioner intended that Additional Interest always equal zero. Because FASIT Rate Interest due to the Noteholders was a function of the asset manager's fee and other FASIT expenses, Additional Interest calculations were a function of each of those items. The 0.00033291153 number in the third step of calculating Additional Interest was used with the intent that Additional Interest would always be zero. This calculation was true as long as (1) the aggregate principal of FASIT assets was equal to the aggregate principal of the Class I Note, Class II Note, and Series A/E Stock and (2) Supplemental Interest for the year was equal to $186,264, which is the amount of Supplemental Interest calculated assuming $12 million of principal on the Class I and Class II Notes.

Petitioner contends that the money market account income was incorporated into the FASIT Rate as a means of distributing the yield on each interest holder's interest in the FASIT arrangement. Respondent's expert Mr. Ahmad explained that there were three possible scenarios for how the money market income was allocated. The first is a pro rata scenario in which the money market income would be included in the numerator of the FASIT Rate, but the money market account principal is not included in the FASIT assets in the denominator. The second is a principal scenario in which the money market income would be included in the numerator and the money market principal income would be included in the denominator. The third is a gain scenario in which the money market income would be treated as gain entirely allocable to the Class I Note and would be excluded from the FASIT Rate computation.

Petitioner used an approach similar to the pro rata scenario. Because the money market account principal was not included in the denominator of the computation of the FASIT Rate, the FASIT Rate Interest increased and Additional Interest was reduced by the same amount. Mr. Ahmad explained that the pro rata approach resulted in an excess allocation to the Series A/E Stockholder and the Class II Noteholder.

Both the principal scenario and the gain scenario are similar to the terms of the 2000 and 2003 AMAs. The principal scenario follows the FASIT Rate in the AMAs because the money market interest is included in earned income of the FASIT and money market principal is included in the FASIT assets. The gain scenario follows the AMAs because gain allocated to the FASIT assets should be allocated to the Class I Noteholder.

Petitioner's use of a pro rata approach resulted in the Series A/E Stock's receiving more of the earnings from the money market account. This allocation of FASIT income deviated from the transaction documents, resulting in the Series A/E Stock's receiving more interest than the weighted average. Since the Series A/E Stock did not receive dividends based on a weighted average, the Series A/E Stockholder did not hold a qualified regular interest, resulting in the FASIT arrangement's being invalid. *See* § 860L(b)(1)(A)(ii); Treas. Reg. § 1.860G-1(a)(3)(ii)(B).

2.    *Effect of Chase's Withdrawal on the Series A/E Stock's Status as a Regular Interest*

Following Chase's withdrawal from the FASIT and repayment of the Class II Note in 2003, petitioner and Dynamo executed the 2003 AMA to reflect Chase's withdrawal. The principal amount of Dynamo's Class I Note was reduced from $500,000 to $100,000. The terms governing the allocation of FASIT income, including the calculation of FASIT Rate Interest, Supplemental Interest, and Additional Interest were left unchanged. Dynamo did not file a new or updated FASIT election reflecting the revised structure of the FASIT. Dynamo continued claiming an expense for "Interest on Senior FASIT Regular Interest," but in a lower amount than in prior years.

Respondent argues that the failure to update, and the consequent deviation from the terms of the governing documents, caused the Series A/E Stockholder to accrue interest payments or other similar amounts at a rate higher than a permitted variable rate. Petitioner contends that the failure to update the basis point adjustment component of the Additional Interest formula was a scrivener's error. It further contends that the Series A/E Stockholder was still paid on the basis of a weighted average rate, and that any deviation was a permissible modification to a weighted average rate under the regulations.

Respondent's expert Mr. Ahmad described petitioner's position regarding its basis point adjustment from 0.0003291153 to 0.000002774 to ensure that the Additional Interest would always be zero as "modification by conduct." This change to the basis point component of the Additional Interest formula was not made in writing. Before Chase withdrew and Dynamo reduced its exposure, Additional Interest would calculate to zero as long as total Supplemental Interest was $186,264. When the total Supplemental Interest due to the parties decreased to $1,552, the remaining $184,712 was Additional Interest owed to Dynamo according to the formula in the Class I Note.

Petitioner made distributions as if the Additional Interest provision had been updated. Mr. Ahmad explained the effects of petitioner's allocation of income from the underlying assets to Dynamo and the Series A/E Stockholder. The income was allocated as if the Additional Interest formula had been updated. When calculating the Additional Interest rate with a basis modification of 0.000002774, the remaining $184,712 surplus that flowed yearly to the Series A/E

Stockholder should instead have been paid to the holder of the Class I Note.

The increase in return to the Series A/E Stockholder was not a permitted modification to a weighted average rate and resulted in dividends being paid on the Series A/E Stock that were not based on a weighted average rate. Thus, even if the Series A/E Stock had previously been a valid regular interest, it would have ceased to be one upon the withdrawal of Chase from the arrangement in 2003.

### 3. *Changes to the FASIT Arrangement Before January 1, 2005*

The grandfather provisions of the FASIT regime provide that the repeal of the FASIT rules does not apply to a FASIT in existence on October 22, 2004, if the regular interests issued by the FASIT remain outstanding in accordance with the original terms of issuance. AJCA § 835(c)(2). Under the 2000 and 2003 AMAs, the FASIT would terminate on January 15, 2005, and the Class I and II Notes and the Series A/E Stock would be redeemed on the same day. The AMAs included a provision for a five-year extension of the FASIT and a provision requiring written notice of extension of the FASIT. The notice of extension was due by October 15, 2004.

The parties did not provide notice of their decision to extend the FASIT by October 15, 2004. On January 14, 2005, the parties agreed to extend the FASIT for five years and to waive the 90-day renewal requirement. The modification to waive the 90-day renewal notice resulted in a modification of the regular interests issued before October 22, 2004, because the regular interests were no longer outstanding in accordance with their original terms.

Petitioner contends that the FASIT arrangement met the requirements of the grandfather clause. The AMAs provided that the FASIT could be extended only in writing. The waiver of the 90-day renewal notice was not in accordance with the AMA. Since the requirements of the AMA were not met, the Series A/E Stock did not meet the regular interest requirement. The waiver and extension of the FASIT has no legal effect because the FASIT terminated by its own terms.

Additionally, petitioner argues that prior deviations from the contract previously discussed do not violate the grandfather clause requirement that the regular interests continue to remain outstanding

in accordance with their original terms and that the redemption of the Class II Note did not cause the arrangement to fail to meet the grandfather clause requirements. We disagree.

The Series A/E Stock received Additional Interest from the money market income that was not computed as provided for in the AMA and the formula in the Class I Note. After September 30, 2003, the Series A/E Stock received amounts that originally were to be paid to the Class I and Class II Noteholders as Supplemental Interest because the formulas relating to Supplemental Interest did not take into account the termination of the Class II Note upon Chase's withdrawal from the FASIT and the reduction in principal of the Class I Note from $500,000 to $100,000. In both of these instances, which are discussed in more detail *supra* Opinion Part II.B.2, there was a modification of regular interests.

These modifications result in a failure to meet the requirement of the grandfather clause because the regular interests did not remain outstanding with the original terms of issuance. The original terms of the AMA, the Class I Note, and the Class II Note were modified.

### 4.    *Conclusion*

We conclude that even if the FASIT arrangement was valid from its inception, it ceased to be a valid FASIT at two other points: (1) in the latter half of 2000 because of the allocation of income earned by the money market account and (2) in the latter half of 2003 because of Chase's withdrawal from the arrangement. Additionally, petitioner has failed to meet the requirements of the grandfather clause.

### III.    *Petitioner's Substantial Compliance Argument*

Petitioner argues alternatively that if the Court agrees with respondent that the FASIT arrangement did not comply with all of the FASIT rules, the arrangement should still be treated as a FASIT because petitioner substantially complied with the FASIT rules and "any minor 'errors' do not deprive the FASIT arrangement of its FASIT status." As discussed *supra* Opinion Part II.A, we conclude that the FASIT arrangement was not a valid arrangement from its inception.

Petitioner argues that it took all reasonable steps to, and intended to, comply with the FASIT statutory requirements and the accompanying regulations. Respondent argues that the substantial compliance doctrine does not apply and that it is a "narrow equitable

doctrine." *See Samueli v. Commissioner*, 132 T.C. 336, 345 (2009). Respondent does not dispute that petitioner intended to enter into a FASIT in 2000.

When there is a failure to comply with the essential requirements of the governing statute, no defense of substantial compliance is available. *Estate of Clause v. Commissioner*, 122 T.C. 115, 122 (2004). When requirements relate "to the substance or essence of the statute," we require "strict adherence to all statutory and regulatory requirements." *Bond v. Commissioner*, 100 T.C. 32, 41 (1993) (quoting *Taylor v. Commissioner*, 67 T.C. 1071, 1077 (1977)). On the other hand, if requirements are "procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict compliance." *Id.* (quoting *Taylor*, 67 T.C. at 1077–78).

In this case statutory requirements must be met for there to be a valid FASIT arrangement. We have held that if a taxpayer wished to take advantage of subchapter S provisions, the taxpayer must comply with all of the statutorily mandated requirements. *Combs v. Commissioner*, T.C. Memo. 1989-206, 57 T.C.M. (CCH) 288, 290, *aff'd*, 907 F.2d 151 (6th Cir. 1990) (unpublished table decision); *see also Brutsche v. Commissioner*, 585 F.2d 436, 439 (10th Cir. 1978), *vacating and remanding* 65 T.C. 1034 (1976).

In *Dirks v. Commissioner*, T.C. Memo. 2004-138, 87 T.C.M. (CCH) 1403, 1405, *aff'd*, 154 F. App'x 614 (9th Cir. 2005), the Court declined to apply the substantial compliance doctrine to the statutory 60-day deadline applicable to individual retirement account rollovers under section 408(d)(3)(A) because "the 60-day rule is not regulatory but is found in the statute itself." As in *Dirks*, the Court is asked whether the substantial compliance doctrine applies to a Code section.

Respondent's adjustments in the Notice of Deficiency are primarily based on Code sections. The statute creating FASITs provided five requirements for an entity to be treated as a FASIT, and these requirements are in the conjunctive. *See* § 860L(a). Additionally, Congress placed limits on the yields that regular interests in a FASIT could provide to their holders and required unconditional and pre-specified interest payments and return of principal. *See* § 860L(b)(1)(A). The FASIT arrangement at issue was not a valid FASIT from its inception because the Series A/E Stock did not meet the requirements of regular interest as discussed *supra* Opinion Part II.A. The statute is

clear that all the requirements need to be met in order for an arrangement to be treated as a FASIT. Accordingly, the substantial compliance doctrine does not apply.

Petitioner has failed to show that the arrangement among it, SAAN, Dynamo, and Chase was a valid FASIT from its inception, before 2003, and on October 22, 2004, when the FASIT repeal became effective. Specifically, the Series A/E Stock was not a valid regular interest under section 860L(a)(1)(B). Additionally, substantial compliance does not apply to section 860L(b)(1).

IV.  *Beneficial Ownership*

In the alternative, petitioner contends that it should not be required to recognize or pay tax on the income from the FASIT assets because it was not the beneficial owner of those assets. Petitioner argues that the FASIT investors are the beneficial owners of those assets.

The facts are inconsistent with petitioner's argument. Petitioner had legal title to the intercompany receivables set forth in the election. Petitioner did not use the funds received from the issuance of the Class I Note, the Class II Note, and the Series A/E Stock to acquire the underlying intercompany receivables because it was already the legal owner of the assets.

As asset manager, petitioner could replace the assets with permitted assets without the consent of the investors. Only petitioner, and not the investors, had legal recourse if debtors failed to make payment on the intercompany receivables. The investors had only contractual rights to amounts based on the proceeds from the intercompany receivables.

Respondent contends that if the FASIT rules do not apply, the assets held in the structure are corporate assets. Courts have applied the following factors to determine the ownership of securities: (1) the risk of investment loss, (2) the opportunity for investment gain, (3) the ability to select and control the securities for investment, and (4) the right to exercise other prerogatives of ownership. *GWA, LLC v. Commissioner*, T.C. Memo. 2025-34, at *71. After application of the factors we conclude that petitioner was the beneficial owner.

The risk of loss factor likely favors petitioner as beneficial owner because Dynamo and Chase had no risks in relation to the underlying

assets and were limited to the recourse provided in the Class I Note and the Class II Note. The opportunity for gain factor is neutral since both petitioner and the investors had the opportunity for investment gain.

The third and fourth factors favor petitioner as the beneficial owner. Petitioner, not the investors, was a party to the intercompany receivables and had the right to sell or dispose of, change, or modify the intercompany receivables consistent with the terms of the arrangement.

Additionally, petitioner relies upon *Geftman v. Commissioner*, 154 F.3d 61 (3d Cir. 1998), *rev'g in part* T.C. Memo. 1996-447. In *Geftman*, the U.S. Court of Appeals for the Third Circuit, to which this case is appealable absent a stipulation to the contrary, concluded that corporations were the beneficial owners of certain mortgages by relying upon two factors: (1) control over the property and (2) the right to economic benefits. *Id.* The Third Circuit looked to who had actual control over the mortgages and their benefits. In this case, petitioner had control over the assets. Both petitioner and the investors had economic benefits in the intercompany receivables, but only petitioner held title, possession, and control over the intercompany receivables. Petitioner also could sell or exchange the intercompany receivables.

Petitioner contends that the FASIT arrangement was designed as a passthrough structure and that the yearly proceeds from the FASIT assets went to pay returns to the Class I and Class II Noteholders and any residual profits went to the Series A/E Stockholder. Petitioner has not provided a legal or factual basis to support its argument that the FASIT arrangement was a passthrough. From the record of this case, petitioner has failed to show that it was not the beneficial owner of the assets.[14]

V.    *Whether the Series A/E Stock Was in Substance Debt or Equity*

Upon cessation of a qualified FASIT, regular interest holders are treated as exchanging their regular interests for interests in the

---

[14] Petitioner did not raise the beneficial ownership argument until the filing of its Pretrial Memoranda. Respondent contends that he would be prejudiced if we were to consider petitioner's beneficial ownership argument. We tend to agree; however, we are able to decide this issue on the evidence before us. *See Smalley v. Commissioner*, 116 T.C. 450, 456 (2001); *see also Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981) (stating that whether a taxpayer experiences the benefits and burdens of ownership of an asset is a question of fact which must be ascertained from the intent of the parties as evidenced by their written agreements).

underlying arrangement. Prop. Treas. Reg. § 1.860H-3(c)(2) and (3), 65 Fed. Reg. 5807, 5821–22 (Feb. 7, 2000). Interests in the underlying arrangement are classified as debt or equity under general principles of federal tax law. *Id.* If a valid FASIT never existed or ceased to exist, the segregated pool of assets would be considered assets of the owner. *Id.* para. (c)(1), 65 Fed. Reg. at 5821.

In this case petitioner would be the actual owner of the FASIT assets. The underlying contracts would remain in effect. The interest payments made to Dynamo would be deductible as interest expenses. The payments made to the Series A/E Stockholders would be dividends paid on equity and would not be deductible for U.S. tax purposes. As a result of our conclusion that the FASIT was invalid, petitioner's taxable income should increase by an amount equal to the earnings on the FASIT assets less the interest paid to Dynamo, petitioner's asset management fee, and any other expenses of the FASIT.

Petitioner contends, as an alternative argument, that the Series A/E Stock is debt in substance and that the "dividend payments" on the Series A/E Stock are in substance deductible interest. Respondent contends that the Series A/E Stock should be treated as equity and not debt. We agree with respondent.

In resolving questions of debt versus equity, courts have identified and considered various factors. *Calumet Indus., Inc. v. Commissioner*, 95 T.C. 257, 285 (1990); *see also Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476, 493 (1980). Petitioner has the burden of showing that Series A/E Stock is debt. *See Dixie Dairies Corp.*, 74 T.C. at 493.

The Third Circuit, has identified sixteen factors to consider in this analysis. *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968). The *Fin Hay* factors are:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the

instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.*

In *Scriptomatic, Inc. v. United States*, 555 F.2d 364, 367–68 (3d Cir. 1977), the Third Circuit identified the ultimate issue under *Fin Hay* as whether the transaction, when measured by objective standards, "would have taken the same form had it been between the corporation and an outside lender." "It is only within this framework that the many factors listed in *Fin Hay* and in other court decisions in this area have any meaning or function." *Id.* at 368.

No single factor is determinative, and not all factors are applicable in each case. *Dixie Dairies Corp.*, 74 T.C. at 493. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." *Id.* at 494 (quoting *Estate of Mixon v. United States*, 464 F.2d 394, 403 (5th Cir. 1972)). In our analysis we address the most relevant factors.

A.      *Intent of the Parties*

We analyze the objective facts to determine whether the parties had a reasonable expectation of repayment, whether their intentions comported with the economic reality of the debtor-creditor relationship, and how they treated the relevant documents. *See Lane v. United States* (*In Re Lane*), 742 F.2d 1311, 1316–17 (11th Cir 1984); *see also Geftman v. Commissioner*, 154 F.3d at 68. Transactions between related parties are "subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt." *Geftman v. Commissioner*, 154 F.3d at 68 (quoting *United States v. Uneco, Inc.* (*In re Uneco, Inc.*), 532 F.2d 1204, 1207 (8th Cir. 1976)).

Petitioner contends that the parties intended the Series A/E Stock to be debt because regular interests in a FASIT are statutorily treated as debt. It further contends that the transaction was structured so that the Series A/E Stockholder would receive yearly a predictable share of

income from the FASIT assets and a return of its invested capital at the end of the transaction. Respondent's position is that petitioner's intent to implement a FASIT is immaterial, and that the attributes of the Series A/E Stock itself are those of equity and, accordingly, the payments on the Series A/E Stock would not have been deductible as interest payments.

Without the statutory exception, the parties to the FASIT intended the Series A/E Stock to be equity. Petitioner labeled the Series A/E Stock, and referred to it, as stock in employee emails, transaction documents, and petitioner's approval presentation. Even as far back as Babcock & Brown's promotional materials, SAAN's interest was characterized as stock.

The objective features of the Series A/E Stock further indicate that, but for its being issued as part of the FASIT, the parties intended the Series A/E Stock to represent equity. The Stock Certificate pertaining to the Series A/E Stock relevantly provided its holder the following rights and restrictions: (1) authorization of petitioner's board of directors to declare dividends on the Series A/E Stock, (2) provision of corporate management rights, including the ability to vote for one of petitioner's directors, and (3) allocation of no rights typically afforded corporate creditors.

Additionally, petitioner treated the Series A/E Stock as equity for accounting purposes. The principal motivation to create a FASIT was to allow dividend payments on the Series A/E Stock to be treated as deductible interest payments. Petitioner intended that the French taxing authority treat the Series A/E Stock as equity. Its own document explaining the arrangement indicates that "so-called regular interests are deductible regardless of the actual form of such interest." Because petitioner, aside from its intention to create a valid FASIT, treated the Series A/E Stock as equity, this factor favors the conclusion that the Series A/E Stock was equity.

B.     *SAAN's Identity of Interests as Creditor and Stockholder*

SAAN purchased the Series A/E Stock from an entity with which it shared a common parent. The Series A/E Stock was part of a tax arbitrage transaction, the benefits of which would accrue to the multinational group as a whole. As a result, the interests of all parties to the FASIT were not aligned with enforcing the rights afforded to them by the instruments they held, but rather to keep the FASIT intact.

SAAN advanced approximately 98% of the funding of the FASIT in exchange for the Series A/E Stock and expected, with minor adjustments, pro rata returns. This indicates that SAAN's advance was made in exchange for an equity interest. Because of the allocation of economic interests in the FASIT with respect to the Series A/E Stock and the interrelatedness of the parties, this factor favors the conclusion that the Series A/E Stock was equity.

C.     *Voting Rights and Participation in Management of Petitioner*

An increase of management rights resulting from an advance generally indicates equity characterization. *NA Gen. P'ship & Subs. v. Commissioner*, T.C. Memo. 2012-172, slip op. at 22. SAAN, as the Series A/E Stockholder, was entitled to one vote per share on all corporate matters and voted with the holders of petitioner's common stock. Further, SAAN was entitled to elect one member of petitioner's board of directors. This factor favors the conclusion that the Series A/E Stock was equity.

D.     *Whether Petitioner Could Have Obtained Third-Party Lending*

"Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." *Fin Hay*, 398 F.2d at 697. A taxpayer's ability to secure financing under similar terms from a third party is relevant in measuring the economic realities of a transaction. *Scriptomatic*, 555 F.2d at 367; *see also NA Gen. P'ship & Subs.*, T.C. Memo. 2012-172, slip op. at 35. In other words, we inquire whether an outside investor would have advanced funds on terms similar to those agreed to by the shareholder. *Scriptomatic*, 555 F.2d at 368.

Petitioner argues that Chase's minor investment in the arrangement from 2001 to 2003 indicates that the FASIT was an attractive investment to third parties. Respondent disputes this argument.

Respondent's expert Mr. Ahmad explained that the Series A/E Stock would not have been marketable to an unrelated third party under its terms for several reasons. Because of the additional risk posed by its subordinated position in the FASIT's capital structure, outside investors

would demand a higher return on the Series A/E Stock than the returns on the Class I and II Notes and the underlying pool of assets.

According to Mr. Ahmad's testimony, the Series A/E Stock received the residual income from the FASIT assets, which was equal to LIBOR plus 0.17% at the outset of the transaction.[15] This is a lower rate of return than LIBOR plus 0.205%, which the initial pool of the underlying FASIT assets offered. The Series A/E Stock's return is also lower than the expected return, LIBOR plus 1.75%, of the Class I Note and the Class II Note. Mr. Ahmad concluded that as a result of its lower rate of return, and because there were publicly available investment grade debt securities that offered higher returns for similar risk at the time the parties formed the arrangement, a third party investor would not have invested in the Series A/E Stock. We find that this factor favors the conclusion that the Series A/E Stock was equity.

E.      *The Risk Involved*

An investor's degree of risk and whether their advance to a corporation is speculative are key factors in determining the economic realities of a transaction. *Scriptomatic*, 555 F.2d at 367. Petitioner argues that the lack of upside potential favors a conclusion that the Series A/E Stock should be treated as debt.

Respondent's experts Messrs. Ahmad and Cohen explained that SAAN was exposed to numerous financial risks. These include the lack of constraint on the credit worthiness of the FASIT assets, the illiquidity of the investment, the lack of remedies or recourse if petitioner violated terms of the Series A/E Stock, the lack of priority to or protection of the FASIT assets against third-party creditors, the Series A/E Stock's position in the FASIT's capital structure, and the uncertainty regarding the amount of the liquidation preference the holder was entitled to at redemption or liquidation. In conjunction these risks made investing in the Series A/E Stock riskier than traditional debt instruments and favor the conclusion that the payment for the stock was an equity advance.

---

[15] At the outset the underlying pool of FASIT assets accrued interest at a rate of LIBOR plus 0.205%, 0.005% of which funded the asset manager's fee. Considering the supplemental interest adjustment that equated to approximately 0.033% of the principal amount of the Series A/E Stock, the rate of interest paid to the Series A/E Stock was approximately LIBOR plus 0.17%.

F.      *Existence of and Labels Given to a Debt Instrument*

The issuance of a debt instrument such as a promissory note, bond, or debenture indicates debt, and the issuance of an equity instrument such as a stock certificate supports equity characterization. *Anchor Nat'l Life Ins. Co. v. Commissioner*, 93 T.C. 382, 404–05 (1989). Regardless of form, a taxpayer is not relieved of its obligation to show that it entered into a debt arrangement, and valid debt may exist between parties even where no formal debt instrument exists. *Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377–78 (1973).

Babcock & Brown's promotional materials and petitioner's approval presentation characterized SAAN's interest as stock or preferred stock. Petitioner contends that even though the Series A/E Stock was formally denominated stock of a corporation, it was created, labeled, and treated like a regular interest in a FASIT, which by statute is treated as debt. The Series A/E Stock would be treated as a regular interest only if the statutory requirements of a FASIT were met. Without the FASIT rules the Series A/E Stock would have been treated as equity. This factor favors the conclusion that the Series A/E Stock was equity.

G.      *The Relative Position of the Series A/E Stock in the FASIT's Capital Structure*

Whether a purported creditor's rights to receive interest and principal payments are subordinated to other creditors' is a factor in whether the funds should be treated as equity. *Estate of Mixon*, 464 F.2d at 406. As discussed *supra* Opinion Part II.A.2, the Series A/E Stock featured no guaranty that any specified amount would be repaid as interest or principal. Petitioner structured the terms of the Series A/E Stock such that it received the residual income and residual principal upon liquidation from the FASIT assets. An interest entitled to the residuary of a corporation's earnings and assets is inherently subordinated to the other creditors and/or shareholders of that corporation.

The 2000 and 2003 AMAs provided that payments due on the Class I Note, the Class II Note, and the Series A/E Stock were to be made only from the revenue generated by the FASIT assets. Additionally, the Class I Note and the Class II Note and the Series A/E Stock were to remain outstanding if the arrangement was never, or ceased to be, a

FASIT. In such a case, the Series A/E Stock would have been in the most subordinated position in petitioner's capital structure.

Petitioner's failure to show that the FASIT assets were protected from its general creditors in the case of bankruptcy indicates that the Series A/E Stock was subordinated to the general creditors and other common shareholders of petitioner. Petitioner's expert Dr. Cragg testified that the Class I Note's having priority over the Series A/E Stock did not indicate that the instrument was equity because corporate borrowers issue different tiers of debt.

Respondent's expert Mr. Ahmad countered in his rebuttal report that the Series A/E Stock was in the most subordinated position in the transaction. He explained that the junior-most tranche in a securitization is considered equity because it receives residual cashflows. Its returns depend on the performance of the securitized assets just as equity holders in a company rely on the performance of the underlying business for their returns. We agree. This factor favors the conclusion that the Series A/E Stock was equity.

H.    *Fixed Rate of Interest*

Predictable and consistent interest payments, such as those determined with reference to a fixed rate or variable rate with reference to a benchmark rate, suggest a debtor-creditor relationship. *Fin Hay*, 398 F.2d at 696. Generally, periodic payments that vary in amount and correlate with the undistributed profits of a business are considered dividends on equity. *See Himmel v. Commissioner*, 338 F.2d 815, 817 (2d Cir. 1964), *rev'g* 41 T.C. 62 (1963).

The payments owed to SAAN as the Series A/E Stockholder were subject to the discretion of petitioner's board of directors and were defined as the FASIT's earnings less the payments owed on the Class I Note, the Class II Note, and the FASIT's expenses, effectively a residual amount. Petitioner has not shown that the Series A/E Stock would receive a fixed rate of interest. This factor favors the conclusion that the Series A/E Stock was equity.

I.    *Contingency on the Obligation to Repay*

Whether an advance of funds featured objective, economic factors that suggest the lender took the customary steps, such as obtaining a security interest in assets of the obligor, to ensure repayment helps

determine whether the advance gave rise to debt or equity. *Geftman v. Commissioner*, 154 F.3d at 71–72.

With respect to both dividend payments and repayment of the Series A/E Stock's original issue price, SAAN was entitled to an amount determined by the income, and FMV, of the FASIT assets. The timing and amount of payment of such dividends were at the discretion of petitioner's board of directors. As discussed *supra* Findings of Fact Part II.B, the residual interest in the cashflow of the FASIT and the liquidation preference that the Series A/E Stockholder was entitled to did not guarantee a return of the stock's original issue price. SAAN had no mechanism to enforce payment of dividends or to require repayment of the full original issue price of the Series A/E Stock.

Further, SAAN's right to a liquidation preference was not secured by any assets of petitioner beyond the Series A/E Stock's rights to the residual cashflows of the FASIT assets and the liquidation preference. The FASIT's having a security interest in the receivables of API did not serve as protection for SAAN's interest specifically, which was limited to the liquidation preference of the FASIT, but to the FASIT arrangement as a whole. The security interest mitigated the credit risk the FASIT was exposed to by holding the 2003 and 2005 Loans, but it did not guarantee anything to SAAN as the Series A/E Stockholder. These residual interests did not guarantee the Series A/E Stock dividends at a predictable rate or unconditionally entitle SAAN to return of the entire original issue price. This factor favors the conclusion that the Series A/E Stock was equity.

J.     *Source of Interest Payments*

If interest payments on an advance are funded by corporate earnings, the advance looks like an equity contribution. *Anchor Nat'l Life Ins. Co.*, 93 T.C. at 406. When repayment is not dependent upon earnings, the interest is more likely to be characterized as a loan. *Id.*

Under the 2000 and 2003 AMAs, dividends paid on the Series A/E Stock were funded by the undistributed profits of the FASIT only, and not from any of petitioner's other assets. Further, petitioner failed to follow the terms of the AMAs throughout the term of the arrangement by paying to the Series A/E Stockholder additional profits earned as interest from a money market account and after Chase's withdrawal from the arrangement. Since the source of the dividends was restricted to the FASIT's earnings, and the amounts of the dividends fluctuated

with the income the FASIT earned and the amount of FASIT assets it held, this factor favors the conclusion that the Series A/E Stock was equity.

K.    *Timing of Advance with Reference to the Organization of the Corporation*

If a corporation uses an advance of funds to acquire its initial assets, or the advance represents a long-term commitment dependent on the future value of the corporation's assets, the advance looks more like an equity advance. *See S.P. Realty Co. v. Commissioner*, T.C. Memo. 1968-156, 27 T.C.M. (CCH) 764 (citing *Fin Hay*, 398 F.2d 694); *see also Estate of Mixon*, 464 F.2d at 410–11. Petitioner argues that because the Series A/E Stock was issued long after petitioner's formation, this factor does not favor equity.

The Series A/E Stock had an interest in the FASIT arrangement and not in all the assets of the corporation. The payments to the Series A/E Stockholder depended on the success of the FASIT arrangement. The Series A/E Stock represents an equity interest in the segregated pool of assets. Accordingly, this factor weighs in favor of equity.

L.    *Debt Versus Equity Conclusion*

Our review of the terms of the Series A/E Stock in the light of the *Fin Hay* factors resulted in 11 factors favoring equity. Additionally, the intent of the parties to the arrangement clearly favors the conclusion that the Series A/E Stock was equity. Accordingly, the Series A/E Stock should not be treated as a debt instrument.

VI.    *Conclusion*

Petitioner has not established that the arrangement among itself, SAAN, and Dynamo was a valid FASIT for the years in issue. Additionally, the substantial compliance doctrine does not apply to section 860L(b)(1), and petitioner did not show that it was not the beneficial owner of the FASIT assets. Petitioner must recognize the interest income generated by the FASIT assets. We further conclude that the Series A/E Stock was in substance equity, and petitioner may not deduct amounts paid as dividends to SAAN as deductible interest payments.

We have considered the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*